# FOLEY *v.* CONNELIE, SUPERINTENDENT OF NEW YORK STATE POLICE, ET AL.

No. 76–839.   Argued November 8, 1977—Decided March 22, 1978

BURGER, C. J., delivered the opinion of the Court, in which STEWART, WHITE, POWELL, and REHNQUIST, JJ., joined. STEWART, J., filed a concurring opinion, *post,* p. 300. BLACKMUN, J., filed an opinion concurring in the result, *post,* p. 300. MARSHALL, J., filed a dissenting opinion, in which BRENNAN and STEVENS, JJ., joined, *post,* p. 302. STEVENS, J., filed a dissenting opinion, in which BRENNAN, J., joined, *post,* p. 307.

*Jonathan A. Weiss* argued the cause for appellant. With him on the briefs was *David S. Preminger.*

*Judith A. Gordon,* Assistant Attorney General of New York, argued the cause for appellees. With her on the brief were *Louis J. Lefkowitz,* Attorney General, and *Samuel A. Hirshowitz,* First Assistant Attorney General.[*]

MR. CHIEF JUSTICE BURGER delivered the opinion of the Court.

We noted probable jurisdiction in this case to consider whether a State may constitutionally limit the appointment of members of its police force to citizens of the United States. 430 U. S. 944 (1977).

The appellant, Edmund Foley, is an alien eligible in due course to become a naturalized citizen, who is lawfully in this country as a permanent resident. He applied for appointment as a New York State trooper, a position which is filled on the basis of competitive examinations. Pursuant to a New York statute, N. Y. Exec. Law § 215 (3) (McKinney 1972), state authorities refused to allow Foley to take the examination. The statute provides:

> "No person shall be appointed to the New York state police force unless he shall be a citizen of the United States."

Appellant then brought this action in the United States District Court for the Southern District of New York, seeking a declaratory judgment that the State's exclusion of aliens from its police force violates the Equal Protection Clause of the Fourteenth Amendment. After Foley was certified as representative of a class of those similarly situated, a three-judge

---

[*]*Vilma S. Martinez* and *Morris J. Baller* filed a brief for the Mexican American Legal Defense and Educational Fund, Inc., et al. as *amici curiae* urging reversal.

District Court was convened to consider the merits of the claim. The District Court held the statute to be constitutional. 419 F. Supp. 889 (1976). We affirm.

## I

The essential facts in this case are uncontroverted. New York Exec. Law § 215 (3) (McKinney 1972) prohibits appellant and his class from becoming state troopers. It is not disputed that the State has uniformly complied with this restriction since the statute was enacted in 1927. Under it, an alien who desires to compete for a position as a New York State trooper must relinquish his foreign citizenship and become an American citizen. Some members of the class, including appellant, are not currently eligible for American citizenship due to waiting periods imposed by congressional enactment.[1]

A trooper in New York is a member of the state police force, a law enforcement body which exercises broad police authority throughout the State. The powers of troopers are generally described in the relevant statutes as including those functions traditionally associated with a peace officer. Like most peace officers, they are charged with the prevention and detection of crime, the apprehension of suspected criminals, investigation of suspect conduct, execution of warrants and have powers of search, seizure and arrest without a formal warrant under limited circumstances. In the course of carrying out these responsibilities an officer is empowered by New York law to resort to lawful force, which may include the use of any weapon that he is required to carry while on duty. All troopers are on call 24 hours a day and are required to take appropriate action whenever criminal activity is observed.

---

[1] We recognize that New York's statute may effectively prevent some class members from ever becoming troopers since state law limits eligibility for these positions to those between the age of 21 and 29 years. N. Y. Exec. Law § 215 (3) (McKinney 1972).

Perhaps the best shorthand description of the role of the New York State trooper was that advanced by the District Court: "State police are charged with the enforcement of the law, not in a private profession and for the benefit of themselves and their clients, but for the benefit of the people at large of the State of New York." 419 F. Supp., at 896.

## II

Appellant claims that the relevant New York statute violates his rights under the Equal Protection Clause.

The decisions of this Court with regard to the rights of aliens living in our society have reflected fine, and often difficult, questions of values. As a Nation we exhibit extraordinary hospitality to those who come to our country,[2] which is not surprising for we have often been described as "a nation of immigrants." Indeed, aliens lawfully residing in this society have many rights which are accorded to noncitizens by few other countries. Our cases generally reflect a close scrutiny of restraints imposed by States on aliens. But we have never suggested that such legislation is inherently invalid, nor have we held that all limitations on aliens are suspect. See *Sugarman* v. *Dougall,* 413 U. S. 634, 648 (1973). Rather, beginning with a case which involved the denial of welfare assistance essential to life itself, the Court has treated certain restrictions on aliens with "heightened judicial solicitude," *Graham* v. *Richardson,* 403 U. S. 365, 372 (1971), a treatment deemed necessary since aliens—pending their eligibility for citizenship—have no direct voice in the political processes. See *United States* v. *Carolene Products Co.,* 304 U. S. 144, 152–153, n. 4 (1938).[3]

---

[2] One indication of this attitude is Congress' determination to make it relatively easy for immigrants to become naturalized citizens. See 8 U. S. C. § 1427 (1976 ed.).

[3] The alien's status is, at least for a time, beyond his control since

Following *Graham,* a series of decisions has resulted requiring state action to meet close scrutiny to exclude aliens as a class from educational benefits, *Nyquist* v. *Mauclet,* 432 U. S. 1 (1977); eligibility for a broad range of public employment, *Sugarman* v. *Dougall, supra;* or the practice of licensed professions, *Examining Board* v. *Flores de Otero,* 426 U. S. 572 (1976); *In re Griffiths,* 413 U. S. 717 (1973). These exclusions struck at the noncitizens' ability to exist in the community, a position seemingly inconsistent with the congressional determination to admit the alien to permanent residence. See *Graham, supra,* at 377–378; Barrett, Judicial Supervision of Legislative Classifications—A More Modest Role For Equal Protection?, 1976 B. Y. U. L. Rev. 89, 101.[4]

It would be inappropriate, however, to require every statutory exclusion of aliens to clear the high hurdle of "strict scrutiny," because to do so would "obliterate all the distinctions between citizens and aliens, and thus depreciate the historic values of citizenship." *Mauclet, supra,* at 14 (BURGER, C. J., dissenting). The act of becoming a citizen is more than a ritual with no content beyond the fanfare of ceremony. A new citizen has become a member of a Nation, part of a people distinct from others. Cf. *Worcester* v. *Georgia,* 6 Pet. 515, 559 (1832). The individual, at that point, belongs to the polity and is entitled to participate in the processes of democratic decisionmaking. Accordingly, we have recognized "a State's historical power to exclude aliens from participation in its democratic political institutions," *Dougall, supra,* at 648, as

---

Congress has imposed durational residency requirements for the attainment of citizenship. Federal law generally requires an alien to lawfully reside in this country for five years as a prerequisite to applying for naturalization. 8 U. S. C. § 1427 (a) (1976 ed.).

[4] In *Mauclet,* for example, New York State policy reflected a legislative judgment that higher education was " 'no longer . . . a luxury; it is a necessity for strength, fulfillment and survival.' " 432 U. S., at 8 n. 9.

part of the sovereign's obligation " 'to preserve the basic conception of a political community.' " 413 U. S., at 647.

The practical consequence of this theory is that "our scrutiny will not be so demanding where we deal with matters firmly within a State's constitutional prerogatives." *Dougall, supra,* at 648. The State need only justify its classification by a showing of some rational relationship between the interest sought to be protected and the limiting classification. This is not intended to denigrate the valuable contribution of aliens who benefit from our traditional hospitality. It is no more than recognition of the fact that a democratic society is ruled by its people. Thus, it is clear that a State may deny aliens the right to vote, or to run for elective office, for these lie at the heart of our political institutions. See 413 U. S., at 647–649. Similar considerations support a legislative determination to exclude aliens from jury service. See *Perkins* v. *Smith,* 370 F. Supp. 134 (Md. 1974), aff'd, 426 U. S. 913 (1976). Likewise, we have recognized that citizenship may be a relevant qualification for fulfilling those "important nonelective executive, legislative, and judicial positions," held by "officers who participate directly in the formulation, execution, or review of broad public policy." *Dougall, supra,* at 647. This is not because our society seeks to reserve the better jobs to its members. Rather, it is because this country entrusts many of its most important policy responsibilities to these officers, the discretionary exercise of which can often more immediately affect the lives of citizens than even the ballot of a voter or the choice of a legislator. In sum, then, it represents the choice, and right, of the people to be governed by their citizen peers. To effectuate this result, we must necessarily examine each position in question to determine whether it involves discretionary decisionmaking, or execution of policy, which substantially affects members of the political community.[5]

---

[5] This is not to say, of course, that a State may accomplish this end with

The essence of our holdings to date is that although we extend to aliens the right to education and public welfare, along with the ability to earn a livelihood and engage in licensed professions, the right to govern is reserved to citizens.

## III

A discussion of the police function is essentially a description of one of the basic functions of government, especially in a complex modern society where police presence is pervasive. The police function fulfills a most fundamental obligation of government to its constituency. Police officers in the ranks do not formulate policy, *per se,* but they are clothed with authority to exercise an almost infinite variety of discretionary powers.[6] The execution of the broad powers vested in them affects members of the public significantly and often in the most sensitive areas of daily life. Our Constitution, of course, provides safeguards to persons, homes and possessions, as well as guidance to police officers. And few countries, if any, provide more protection to individuals by limitations on the power and discretion of the police. Nonetheless, police may, in the exercise of their discretion, invade the privacy of an individual in public places, *e. g., Terry* v. *Ohio,* 392 U. S. 1 (1968). They may under some conditions break down a door to enter a dwelling or other building in the execution of a warrant, *e. g., Miller* v. *United States,* 357 U. S. 301 (1958), or without a formal warrant in very limited circumstances; they may stop vehicles traveling on public highways, *e. g., Pennsylvania* v. *Mimms,* 434 U. S. 106 (1977).

---

a citizenship restriction that "sweeps indiscriminately," *Dougall,* 413 U. S., at 643, without regard to the differences in the positions involved.

[6] See ABA Project on Standards for Criminal Justice, The Urban Police Function 119 (App. Draft 1973); National Advisory Commission on Criminal Justice Standards and Goals, Police 22–23 (1973); President's Commission on Law Enforcement and Administration of Justice, The Challenge of Crime in a Free Society 10 (1967).

An arrest, the function most commonly associated with the police, is a serious matter for any person even when no prosecution follows or when an acquittal is obtained. Most arrests are without prior judicial authority, as when an officer observes a criminal act in progress or suspects that felonious activity is afoot. Even the routine traffic arrests made by the state trooper—for speeding, weaving, reckless driving, improper license plates, absence of inspection stickers, or dangerous physical condition of a vehicle, to describe only a few of the more obvious common violations—can intrude on the privacy of the individual. In stopping cars, they may, within limits, require a driver or passengers to disembark and even search them for weapons, depending on time, place and circumstances. That this prophylactic authority is essential is attested by the number of police officers wounded or killed in the process of making inquiry in borderline, seemingly minor violation situations—for example, where the initial stop is made for a traffic offense but, unknown to the officer at the time, the vehicle occupants are armed and engaged in or embarked on serious criminal conduct.

Clearly the exercise of police authority calls for a very high degree of judgment and discretion, the abuse or misuse of which can have serious impact on individuals.[7] The office of a policeman is in no sense one of "the common occupations of the community" that the then Mr. Justice Hughes referred to in *Truax* v. *Raich,* 239 U. S. 33, 41 (1915). A policeman vested with the plenary discretionary powers we have described is not to be equated with a private person engaged in routine public employment or other "common occupations of the community" who exercises no broad power over people gen-

---

[7] After the event, some abuses of power may be subject to remedies by one showing injury. See *Bivens* v. *Six Unknown Fed. Narcotics Agents,* 403 U. S. 388 (1971). And conclusive evidence of criminal conduct may be kept from the knowledge of a jury because of police error or misconduct.

erally. Indeed, the rationale for the qualified immunity historically granted to the police rests on the difficult and delicate judgments these officers must often make. See *Pierson* v. *Ray,* 386 U. S. 547, 555–557 (1967); cf. *Scheuer* v. *Rhodes,* 416 U. S. 232, 245–246 (1974).

In short, it would be as anomalous to conclude that citizens may be subjected to the broad discretionary powers of non-citizen police officers as it would be to say that judicial officers and jurors with power to judge citizens can be aliens. It is not surprising, therefore, that most States expressly confine the employment of police officers to citizens,[8] whom the State may reasonably presume to be more familiar with and sym-

---

[8] Twenty-four States besides New York specifically require United States citizenship as a prerequisite for becoming a member of a statewide law enforcement agency: see Ark. Stat. Ann. § 42–406 (1964); Cal. Govt. Code Ann. § 1031 (West Supp. 1978); Fla. Stat. Ann. § 943.13 (2) (West Supp. 1976); Ga. Code § 92A–214 (Supp. 1977); Ill. Rev. Stat., ch. 121, § 307.9 (1975); Ind. Rules & Regs., Tit. 10, Art. 1, ch. 1, § 4–7 (1976); Iowa Code § 80.15 (1977); Kan. Stat. Ann. § 74–2113 (c) (Supp. 1976); Ky. Rev. Stat. § 16.040 (2)(c) (1971); Mich. Comp. Laws § 28.4 (1967); Miss. Code Ann. § 45–3–9 (Supp. 1977); Mo. Rev. Stat. § 43.060 (1969); Mont. Rev. Codes Ann. § 31–105 (3)(a)(v) (Supp. 1977); Nev. Rev. Stat. § 281.060 (1) (1975); N. H. Rev. Stat. Ann. § 106–B:20 (Supp. 1975); N. J. Stat. Ann. § 53:1–9 (West Supp. 1977); N. M. Stat. Ann. § 39–2–6 (1972); N. D. Cent. Code § 39–03–04 (4) (Supp. 1977); Ore. Rev. Stat. § 181.260 (1)(a) (1977); Pa. Stat. Ann., Tit. 71, § 1193 (Purdon 1962); R. I. Gen. Laws § 42–28–10 (1970); S. D. Comp. Laws Ann. § 3–7–9 and § 3–1–4 (1974); Tex. Rev. Civ. Stat. Ann., Art. 4413 (9)(2) (Vernon 1976); Utah Code Ann. § 27–11–11 (1976). Oklahoma requires its officers to be citizens of the State. See Okla. Stat., Tit. 47, § 2–105 (a) (Supp. 1976). Nine other States require American citizenship as part of a general requirement applicable to all types of state officers or employees: see Ala. Code, Tit. 36, § 2–1 (a)(1) (1977); Ariz. Rev. Stat. Ann. § 38–201 (1974); Haw. Rev. Stat. § 78–1 (1976); Idaho Code § 59–101 (1976) and Idaho Const., Art. 6, § 2; Me. Rev. Stat. Ann., Tit. 5, § 556 (Supp. 1977); Mass. Gen. Laws Ann., ch. 31, § 12 (West Supp. 1977); Ohio Rev. Code Ann. § 124.22 (1978); Tenn. Code Ann. § 8–1801 (Supp. 1977); Vt. Stat. Ann., Tit. 3, § 262 (1972); W. Va. Const., Art. 4, § 4.

pathetic to American traditions.[9]   Police officers very clearly fall within the category of "important nonelective . . . officers who participate directly in the . . . *execution* . . . of broad public policy."   *Dougall,* 413 U. S., at 647 (emphasis added).   In the enforcement and execution of the laws the police function is one where citizenship bears a rational relationship to the special demands of the particular position.   A State may, therefore, consonant with the Constitution, confine the performance of this important public responsibility to citizens of the United States.[10]

Accordingly, the judgment of the District Court is

*Affirmed.*

MR. JUSTICE STEWART, concurring.

The dissenting opinions convincingly demonstrate that it is difficult if not impossible to reconcile the Court's judgment in this case with the full sweep of the reasoning and authority of some of our past decisions.   It is only because I have become increasingly doubtful about the validity of those decisions (in at least some of which I concurred) that I join the opinion of the Court in this case.

MR. JUSTICE BLACKMUN, concurring in the result.

Once again the Court is called upon to adjudicate the constitutionality of one of New York's many statutes that impose

---

[9] Police powers in many countries are exercised in ways that we would find intolerable and indeed violative of constitutional rights.   To take only one example, a large number of nations do not share our belief in the freedom of movement and travel, requiring persons to carry identification cards at all times.   This, *inter alia,* affords a rational basis for States to require that those entrusted with the execution of the laws be individuals who, even if not native Americans, have indicated acceptance and allegiance to our Constitution by becoming citizens.

[10] Cf. *McCarthy* v. *Philadelphia Civil Service Comm'n,* 424 U. S. 645 (1976); *Detroit Police Officers Assn.* v. *Detroit,* 385 Mich. 519, 190 N. W. 2d 97 (1971), dismissed for want of substantial federal question, 405 U. S. 950 (1972).

a requirement of citizenship for occupational activity.* Although I have joined the Court in striking down citizenship requirements of this kind, see *Graham* v. *Richardson,* 403 U. S. 365 (1971); *In re Griffiths,* 413 U. S. 717 (1973); *Examining Board* v. *Flores de Otero,* 426 U. S. 572 (1976), including, specifically, some imposed by the State of New York, see *Sugarman* v. *Dougall,* 413 U. S. 634 (1973); and *Nyquist* v. *Mauclet,* 432 U. S. 1 (1977), I have no difficulty in agreeing with the result the Court reaches here.

The Court's prior cases clearly establish the standards to be applied in this one. *Mauclet,* of course, decided just last Term, is our most recent pronouncement in this area of constitutional law. There, citing *Graham* v. *Richardson,* 403 U. S., at 372, we observed once again that a State's classifications based on alienage "are inherently suspect and subject to close judicial scrutiny," and, citing *Flores de Otero,* 426 U. S., at 605, we went on to say that " 'the governmental interest claimed to justify the discrimination is to be carefully examined in order to determine whether that interest is legitimate and substantial, and inquiry must be made whether the means adopted to achieve the goal are necessary and precisely drawn.' " 432 U. S., at 7. In the same opinion, however, limitations were intimated when, citing *Sugarman* v. *Dougall,* 413 U. S., at 642 and 647, we said:

> "[T]he State's interest 'in establishing its own form of government, and in limiting participation in that government to those who are within "the basic conception of a

---

*One of the appellees in *Nyquist* v. *Mauclet,* 432 U. S. 1 (1977), listed a succession of New York statutes requiring citizenship, or a declaration of intent to become a citizen, for no fewer than 37 occupations. Brief for Appellee Mauclet, O. T. 1976, No. 76–208, pp. 19–22, nn. 8–44, inclusive. Some of the statutes have been legislatively repealed or modified, or judicially invalidated. Others, apparently, are still in effect; among them are those relating to the occupations of inspector, certified shorthand reporter, funeral director, masseur, physical therapist, and animal health technician.

political community" ' might justify some consideration of alienage. But as *Sugarman* makes quite clear, the Court had in mind a State's historical and constitutional powers to define the qualifications of voters, or of 'elective or important nonelective' officials 'who participate directly in the formulation, execution, or review of broad public policy.' [413 U. S.], at 647. See *id.*, at 648." 432 U. S., at 11.

When the State is so acting, it need justify its discriminatory classifications only by showing some rational relationship between its interest in preserving the political community and the classification it employs.

I agree with the Court's conclusion that the State of New York has vested its state troopers with powers and duties that are basic to the function of state government. The State may rationally conclude that those who are to execute these duties should be limited to persons who can be presumed to share in the values of its political community as, for example, those who possess citizenship status. New York, therefore, consistent with the Federal Constitution, may preclude aliens from serving as state troopers.

MR. JUSTICE MARSHALL, with whom MR. JUSTICE BRENNAN and MR. JUSTICE STEVENS join, dissenting.

Almost a century ago, in the landmark case of *Yick Wo* v. *Hopkins,* 118 U. S. 356, 369 (1886), this Court recognized that aliens are "persons" within the meaning of the Fourteenth Amendment. Eighty-five years later, in *Graham* v. *Richardson,* 403 U. S. 365 (1971), the Court concluded that aliens constitute a " 'discrete and insular' minority," and that laws singling them out for unfavorable treatment "are therefore subject to strict judicial scrutiny." *Id.,* at 372, 376. During the ensuing six Terms, we have invalidated state laws discriminating against aliens on four separate occasions, finding

that such discrimination could not survive strict scrutiny. *Sugarman* v. *Dougall,* 413 U. S. 634 (1973) (competitive civil service); *In re Griffiths,* 413 U. S. 717 (1973) (attorneys); *Examining Board* v. *Flores de Otero,* 426 U. S. 572 (1976) (civil engineers); *Nyquist* v. *Mauclet,* 432 U. S. 1 (1977) (financial assistance for higher education).

Today the Court upholds a law excluding aliens from public employment as state troopers. It bases its decision largely on dictum from *Sugarman* v. *Dougall, supra,* to the effect that aliens may be barred from holding "state elective or important nonelective executive, legislative, and judicial positions," because persons in these positions "participate directly in the formulation, execution, or review of broad public policy." 413 U. S., at 647.[1] I do not agree with the Court that state troopers perform functions placing them within this "narro[w] . . . exception," *Nyquist* v. *Mauclet, supra,* at 11, to our usual rule that discrimination against aliens is presumptively unconstitutional. Accordingly I dissent.

In one sense, of course, it is true that state troopers participate in the execution of public policy. Just as firefighters

---

[1] In *Sugarman,* the Court indicated that, if the State were to exclude aliens from these positions, the exclusion would be scrutinized under a standard less demanding than that normally accorded classifications involving a "'discrete and insular' minority." 413 U. S., at 642. The Court did not explain why the level of scrutiny should vary with the nature of the job from which aliens are being excluded, and the focus of this part of the opinion was on the State's interest in preserving "'the basic conception of a political community.'" *Ibid.,* quoting *Dunn* v. *Blumstein,* 405 U. S. 330, 344 (1972); see 413 U. S., at 647–648. *Sugarman* may thus be viewed as defining the circumstances under which laws excluding aliens from state jobs would further a compelling state interest, rather than as defining the circumstances under which lesser scrutiny is applicable. Regardless of which approach is followed, however, the question in this case remains the same: Is the job of state trooper a position involving direct participation "in the formulation, execution, or review of broad public policy"?

execute the public policy that fires should be extinguished, and sanitation workers execute the public policy that streets should be kept clean, state troopers execute the public policy that persons believed to have committed crimes should be arrested. But this fact simply demonstrates that the *Sugarman* exception, if read without regard to its context, "would swallow the rule." *Nyquist, supra,* at 11. Although every state employee is charged with the "execution" of public policy, *Sugarman* unambiguously holds that a blanket exclusion of aliens from state jobs is unconstitutional.

Thus the phrase "execution of broad public policy" in *Sugarman* cannot be read to mean simply the carrying out of government programs, but rather must be interpreted to include responsibility for actually setting government policy pursuant to a delegation of substantial authority from the legislature. The head of an executive agency, for example, charged with promulgating complex regulations under a statute, executes broad public policy in a sense that file clerks in the agency clearly do not. In short, as *Sugarman* indicates, those "elective or important nonelective" positions that involve broad policymaking responsibilities are the only state jobs from which aliens as a group may constitutionally be excluded. 413 U. S., at 647. In my view, the job of state trooper is not one of those positions.

There is a vast difference between the formulation and execution of broad public policy and the application of that policy to specific factual settings. While the Court is correct that "the exercise of police authority calls for a very high degree of judgment and discretion," *ante,* at 298, the judgments required are factual in nature; the policy judgments that govern an officer's conduct are contained in the Federal and State Constitutions, statutes, and regulations.[2] The officer

---

[2] If the state exclusion here were limited to the job of Superintendent of the State Police, a different case would be presented to the extent that

responding to a particular situation is only applying the basic policy choices—which he has no role in shaping—to the facts as he perceives them.[3]  We have previously recognized this distinction between the broad policy responsibilities exercised by high executive officials and the more limited responsibilities of police officers and found it relevant in defining the scope of immunity afforded under 42 U. S. C. § 1983:

> "When a court evaluates police conduct relating to an arrest its guideline is 'good faith and probable cause.'  In the case of higher officers of the executive branch, however, the inquiry is far more complex since the range of decisions and choices—whether the formulation of policy, of legislation, of budgets, or of day-to-day decisions—is virtually infinite. . . .  [S]ince the options which a chief executive and his principal subordinates must consider are far broader and far more subtle than those made by officials with less responsibility, the range of discretion must be comparably broad." *Scheuer* v. *Rhodes,* 416 U. S. 232, 245–247 (1974) (citation omitted).

The Court places great reliance on the fact that policemen make arrests and perform searches, often "without prior judicial authority." *Ante,* at 298.  I certainly agree that "[an] arrest is a serious matter," *ibid.,* and that we should be

this official executes broad public policy in deciding how to deploy officers and in formulating rules governing police conduct.

[3] This view of the differences between those who apply policy and those with policymaking responsibilities was rejected by MR. JUSTICE REHNQUIST in his lone dissenting opinion in *Sugarman.*  His position was that " 'low level' civil servants . . . who apply facts to individual cases are as much 'governors' as those who write the laws or regulations the 'low-level' administrator must 'apply.' " 413 U. S., at 661.  The eight-Justice *Sugarman* majority, in holding as it did, necessarily took the opposite position: that those "who apply facts to individual cases" do not have responsibility for broad policy execution that is in any way comparable to the responsibility exercised by "those who write the laws or regulations."

concerned about all "intru[sions] on the privacy of the individual." *Ibid.* But these concerns do not in any way make it "anomalous" for citizens to be arrested and searched by "noncitizen police officers," *ante,* at 299, at least not in New York State. By statute, New York authorizes "any person" to arrest another who has actually committed a felony or who has committed any other offense in the arresting person's presence. N. Y. Crim. Proc. Law § 140.30 (McKinney 1971). Moreover, a person making an arrest pursuant to this statute is authorized to make a search incident to the arrest.[4] While law enforcement is primarily the responsibility of state troopers, it is nevertheless difficult to understand how the Court can imply that the troopers' arrest and search authority justifies excluding aliens from the police force when the State has given all private persons, including aliens, such authority.

In *Griffiths* we held that the State could not limit the practice of law to citizens, "despite a recognition of the vital public and political role of attorneys," *Nyquist* v. *Mauclet,* 432 U. S., at 11. It is similarly not a denigration of the important public role of the state trooper—who, as the Court notes, *ante,* at 297, operates "in the most sensitive areas of daily life"—to find that his law enforcement responsibilities do not "make him a formulator of government policy." *In re Griffiths,* 413 U. S., at 729. Since no other rational reason, let alone a compelling state interest, has been advanced in sup-

---

[4] See *United States* v. *Rosse,* 418 F. 2d 38, 39–40 (CA2 1969); *United States* v. *Viale,* 312 F. 2d 595, 599, 600 (CA2 1963). Although many of the cases discussing the right of a private individual to make arrests and searches refer to a "citizen" taking the action, see *United States* v. *Swarovski,* 557 F. 2d 40 (CA2 1977), cert. denied, 434 U. S. 1045 (1978); *United States* v. *Rosse, supra,* at 39; *United States* v. *Viale, supra,* it is clear from the context and from the plain language of the statutory provision that the right to arrest is not limited to citizens but applies to "any person."

port of the statute here at issue,[5] I would hold that the statute's exclusion of aliens from state trooper positions violates the Equal Protection Clause of the Fourteenth Amendment.

MR. JUSTICE STEVENS, with whom MR. JUSTICE BRENNAN joins, dissenting.

A State should, of course, scrutinize closely the qualifications of those who perform professional · services within its borders. Police officers, like lawyers, must be qualified in their field of expertise and must be trustworthy. Detailed review of each individual's application for employment is therefore appropriate. Conversely, a rule which disqualifies an entire class of persons from professional employment is doubly objectionable. It denies the State access to unique individual talent; it also denies opportunity to individuals on the basis of characteristics that the group is thought to possess.

The first objection poses a question of policy rather than

---

[5] One other justification for the statute was proffered by the appellee, see App. D-30 (affidavit of Superintendent of State Police), and accepted by the court below:

"The state quite rightly observes that conflicts of allegiance would be most glaring with respect to the alien's duty as a state policeman to make arrests of violators of the federal immigration laws, to participate in the Governor's Detail which provides protection for the Governor and visiting foreign dignitaries, to conduct investigations into matters having to do with government security, and to provide security at events involving foreign visitors such as the 1980 Winter Olympics to be held in Lake Placid, New York." 419 F. Supp. 889, 898 (SDNY 1976).

Not surprisingly, the appellee does not rely on this argument in his brief here, and the Court does not mention it. The suggestion that alien troopers would refuse to enforce the law against other aliens is highly offensive. This rationale would justify the State's refusal to hire members of any group on the basis that the individuals could not be trusted to faithfully enforce the law against other members of their race, nationality, or sex. I would have thought that the day had long since passed when a court would accept such a justification for exclusion of a group from public employment.

constitutional law. The wisdom of a rule denying a law enforcement agency the services of Hercule Poirot or Sherlock Holmes is thus for New York, not this Court, to decide. But the second objection raises a question of a different kind and a satisfactory answer to this question is essential to the validity of the rule: What is the group characteristic that justifies the unfavorable treatment of an otherwise qualified individual simply because he is an alien?

No one suggests that aliens as a class lack the intelligence or the courage to serve the public as police officers. The disqualifying characteristic is apparently a foreign allegiance which raises a doubt concerning trustworthiness and loyalty so pervasive that a flat ban against the employment of any alien in any law enforcement position is thought to be justified. But if the integrity of all aliens is suspect, why may not a State deny aliens the right to practice law? Are untrustworthy or disloyal lawyers more tolerable than untrustworthy or disloyal policemen? Or is the legal profession better able to detect such characteristics on an individual basis than is the police department? Unless the Court repudiates its holding in *In re Griffiths,* 413 U. S. 717, it must reject any conclusive presumption that aliens, as a class, are disloyal or untrustworthy.[1]

A characteristic that all members of the class do possess may provide the historical explanation for their exclusion from some categories of public employment. Aliens do not vote. Aliens and their families were therefore unlikely to have been beneficiaries of the patronage system which controlled access to public employment during so much of our history. The widespread exclusion of aliens from such positions today may

---

[1] It is worth reiterating that "one need not be a citizen in order to take in good conscience an oath to support the Constitution. See *In re Griffiths,* 413 U. S., at 726 n. 18." *Hampton* v. *Mow Sun Wong,* 426 U. S. 88, 111 n. 43.

well be nothing more than a vestige of the historical relationship between nonvoting aliens and a system of distributing the spoils of victory to the party faithful.[2] If that be true, it might explain, but cannot justify, the discrimination.

Even if patronage never influenced the selection of police officers in New York, reference to the law governing denial of public employment for political reasons is nevertheless instructive. In *Elrod* v. *Burns,* 427 U. S. 347, the Court held that most public employees are protected from discharge because of their political beliefs but recognized that an exception was required for policymaking officials.[3] The exception identified in *Burns* was essentially the same as the category of "officers who participate in the formulation, execution, or review of broad public policy" described in *Sugarman* v. *Dougall,* 413 U. S. 634, 647. In both cases the special nature of the policymaking position was recognized as justifying a form of discriminatory treatment that could not be applied to regular employees.

---

[2] "In its historical context, the assumption that only citizens would be employed in the federal service is easily understood. The new system of merit appointment, based on competitive examination, was replacing a patronage system in which appointment had often been treated as a method of rewarding support at the polls; since such rewards were presumably reserved for voters (or members of their families) who would necessarily be citizens, citizenship must have characterized most, if not all, federal employees at that time. The assumption that such a requirement would survive the enactment of the new statute is by no means equivalent to a considered judgment that it should do so." *Id.,* at 107.

[3] "A second interest advanced in support of patronage is the need for political loyalty of employees, not to the end that effectiveness and efficiency be insured, but to the end that representative government not be undercut by tactics obstructing the implementation of policies of the new administration, policies presumably sanctioned by the electorate. The justification is not without force, but is nevertheless inadequate to validate patronage wholesale. Limiting patronage dismissals to policymaking positions is sufficient to achieve this governmental end." *Elrod* v. *Burns,* 427 U. S., at 367.

The Court should draw the line between policymaking and nonpolicymaking positions in as consistent and intelligible a fashion as possible. As MR. JUSTICE MARSHALL points out, *ante,* at 305, in the context of immunity from liability under 42 U. S. C. § 1983, the Court placed the police officer in a different category from the Governor of Ohio. See *Scheuer* v. *Rhodes,* 416 U. S. 232, 245–247. And under *Elrod* v. *Burns, supra,* the Court would unquestionably condemn the dismissal of a citizen state trooper because his political affiliation differed from that of his superiors. Yet, inexplicably, every state trooper is transformed into a high ranking, policymaking official when the question presented is whether persons may be excluded from all positions in the police force simply because they are aliens.

Since the Court does not purport to disturb the teaching of *Sugarman,* this transformation must rest on the unarticulated premise that the police function is at "the heart of representative government" and therefore all persons employed by the institutions performing that function "participate directly in the formulation, execution, or review of broad public policy . . . ." *Sugarman* v. *Dougall, supra,* at 647. In my judgment, to state the premise is to refute it. Respect for the law enforcement profession and its essential function, like respect for the military, should not cause us to lose sight of the fact that in our representative democracy neither the constabulary nor the military is vested with broad policymaking responsibility. Instead, each implements the basic policies formulated directly or indirectly by the citizenry. Under the standards announced in *Sugarman,* therefore, a blanket exclusion of aliens from this particular governmental institution is especially inappropriate.

The Court's misapprehension of the role of the institutionalized police function in a democratic society obfuscates the true significance of the distinction between citizenship and alienage. The privilege of participating in the formulation

of broad public policy—a privilege largely denied to the institutions exercising the police function in our society—is the essence of individual citizenship. It is this privilege which gives dramatic meaning to the naturalization ceremony.[4]   The transition from alienage to citizenship is a fundamental change in the status of a person.   This change is qualitatively different from any incremental increase in economic benefits that may accrue to holders of citizenship papers.   The new citizen's right to vote and to participate in the democratic decisionmaking process is the honorable prerogative which no alien has a constitutional right to enjoy.

In final analysis, therefore, our society is governed by its citizens.   But it is a government of and for all persons subject to its jurisdiction, and the Constitution commands their equal treatment.   Although a State may deny the alien the right to participate in the making of policy, it may not deny him equal access to employment opportunities without a good and relevant reason.   *Sugarman* plainly teaches us that the burgeoning public employment market cannot be totally foreclosed to aliens.   Since the police officer is not a policymaker in this country, the total exclusion of aliens from the police force must fall.

Even if the Court rejects this analysis, it should not uphold a statutory discrimination against aliens, as a class, without expressly identifying the group characteristic that justifies the

---

[4] As the Court eloquently points out:

"The act of becoming a citizen is more than a ritual with no content beyond the fanfare of ceremony.   A new citizen has become a member of a Nation, part of a people distinct from others.   Cf. *Worcester* v. *Georgia*, 6 Pet. 515, 559 (1832).   The individual, at that point, belongs to the polity and is entitled to participate in the processes of democratic decisionmaking.   Accordingly, we have recognized 'a State's historical power to exclude aliens from participation in its democratic political institutions.' *Dougall, supra,* at 648, as part of the sovereign's obligation 'to preserve the basic conception of a political community.'   413 U. S., at 647." *Ante,* at 295–296.

discrimination. If the unarticulated characteristic is concern about possible disloyalty, it must equally disqualify aliens from the practice of law; yet the Court does not question the continuing vitality of its decision in *Griffiths*. Or if that characteristic is the fact that aliens do not participate in our democratic decisionmaking process, it is irrelevant to eligibility for this category of public service. If there is no group characteristic that explains the discrimination, one can only conclude that it is without any justification that has not already been rejected by the Court.[5]

Because the Court's unique decision fails either to apply or to reject established rules of law, and for the reasons stated by MR. JUSTICE MARSHALL, I respectfully dissent.

---

[5] The Court has squarely held that a State may not treat employment as a scarce resource to be reserved for its own citizens. *Sugarman* v. *Dougall,* 413 U. S. 634, 641–645. Nor may a State impose special burdens on aliens to provide them with an incentive to become naturalized citizens. *Nyquist* v. *Mauclet,* 432 U. S. 1, 9–11. For it is the Federal Government that exercises plenary control over naturalization and immigration. *Hampton* v. *Mow Sun Wong,* 426 U. S., at 100–101. The Court's understanding that "most States expressly confine the employment of police officers to citizens," *ante,* at 299, is not persuasive. Most of the statutes cited to support that understanding were enacted before the Court had decided *Sugarman.* Some of the cited statutes are patently invalid as a result of *Sugarman,* and there is no evidence that most of the States referred to by the Court have decided to continue enforcement of their citizenship requirement for police officers after deliberate consideration of *Sugarman's* teaching that only policymaking officials would be unaffected by the holding.