## MOVING PHONES PARTNERSHIP L.P., Appellant,

v.

## FEDERAL COMMUNICATIONS COMMISSION, Appellee,

Thomas Domencich and Committee for a Fair Lottery, Romulus Engineering, Inc., James E. Martin, Jr., CSH Cellular, Gilcom Cellular, L.P., PC Cellular, Inc., RSA Cellular Company, AAT R S A Company, L.P., Excellence II, Elleron Cellular Corporation, Sunde Cellular Communications, Inc., Intervenors.

Nos. 91–1611, 91–1613 through 91–1617, 91–1621, 91–1626, 91–1627, 91–1628, 91–1629 and 91–1636.

United States Court of Appeals, District of Columbia Circuit.

Argued April 8, 1993.

Decided July 30, 1993.

Rehearing and Suggestions for Rehearing En Banc Denied Oct. 5, 1993.

---

1052

A. Thomas Carroccio, for appellants. With him on the joint brief were J. Laurent Scharff, Gertrude J. White, Michael F. Morrone, Mark F. Evens, Michael R. Bennet, Richard O. Wolf, Edward R. Kump, Denise Moline, and Lloyd D. Young. Glen Franklin Koontz also entered an appearance for appellants in Nos. 91–1611, 91–1613, 91–1614, 91–1615, and 91–1616.

Sue Ann Kanter, Counsel, F.C.C., for appellee. On the brief were Renee Licht, Gen. Counsel; Daniel M. Armstrong, Associate Gen. Counsel; and Roberta L. Cook, Counsel, F.C.C. John E. Ingle and Robert L.

Pettit, Counsel, F.C.C., also entered appearances for appellee.

Mark D. Schneider argued the cause for intervenors Thomas Domencich and Committee for a Fair Lottery; James E. Martin, Jr.; CSH Cellular; Gilcom Cellular, L.P.; PC Cellular, Inc.; RSA Cellular Co., Michael B. Azeez; Excellence II; Elleron Cellular Corp.; Percival Vaz; Larsen Cellular Associates; AAT R S A Company, L.P.; Marco Communications Corp.; and Sunde Cellular Communications, Inc. With him on the joint brief were Carter G. Phillips, Carl W. Northrop, Stephen Kaffee, Kenneth E. Hardman, Benito Gaguine, Arthur V. Belendiuk, Thomas Gutierrez, Eliot J. Greenwald, David J. Kaufman, Thomas L. Siebert, and Paul C. Besozzi. George L. Lyon, Jr. entered an appearance for intervenor Gilcom Cellular, L.P. Michael D. Sullivan entered an appearance for intervenor Romulus Engineering, Inc. Richard S. Myers entered an appearance for intervenor Optima Cellular Partnership. Stephen E. Coran entered an appearance for intervenor Excellence II.

Before MIKVA, Chief Judge, and SENTELLE and HENDERSON, Circuit Judges.

Opinion for the Court filed by Circuit Judge SENTELLE.

SENTELLE, Circuit Judge:

Appellants, all partnerships, applied to the Federal Communications Commission ("Commission" or "FCC") for authorization to construct and operate cellular systems. The FCC dismissed the applications on the ground that each proposed to include one or more alien general partners, violating alien ownership restrictions in the Communications Act ("Act"), 47 U.S.C. § 310(b) (1991 Supp.), and the FCC's rules. Because the Commission reasonably interpreted the Act as prohibiting the grant of a radio license to a partnership with aliens among its general partners, and because the dismissal of appellants' applications was reasonable and consistent with the FCC's strict rules for process-

ing cellular applications, we affirm the Commission's decision.

## I.

### A. *Regulatory Framework*

In 1981, the Commission adopted rules to govern commercial implementation of cellular telephone service, 47 C.F.R. § 22 subpart K (1993). In doing so, the FCC divided the spectrum into two frequency blocks, for "wireline carriers" (telephone companies) and "nonwireline carriers" (applicants other than telephone companies), to allow two cellular carriers to be licensed in each market area. Confronting a growing demand for cellular service, the FCC solicited applications for nonwireline cellular systems in each designated market and adopted expedited application filing and processing rules designed to minimize the administrative burden on its staff and to permit orderly processing of thousands of cellular applications. *See, e.g., Cellular Communication Systems,* 86 F.C.C.2d 469, 498–501 (1981), *modified,* 89 F.C.C.2d 58 (1982), *further modified,* 90 F.C.C.2d 571 (1982), *petition for review dismissed, United States v. FCC,* No. 82–1526 (D.C.Cir.1984).

After experiencing significant delays in its expedited comparative hearing process, the Commission decided that selection among competing applications could be conducted most efficiently through lottery in all markets beyond the largest thirty.[1] Under the current procedures, the FCC includes in the lottery all applications that facially comply with processing requirements and contain a certification that the application is complete and contains all information required by the application form and the FCC's cellular rules. *Lottery Further Reconsideration Order,* 59 Rad.Reg.2d (P & F) 407, 410 & n. 16. The FCC applies a "letter-perfect" standard to the pre-lottery requirements. Applications not complying with the initial requirements are dismissed and lose any further opportunity to be considered in the lottery. *Id.*

---

1. *Cellular Lottery Order,* 98 F.C.C.2d 175, 179 (1984), *recon.,* 101 F.C.C.2d 577 (1985), *further recon.,* 59 Rad.Reg.2d (P & F) 407 (1985) (*Lottery*

*Further Reconsideration Order*), *aff'd in relevant part, Maxcell Telecom Plus, Inc. v. FCC,* 815 F.2d 1551 (D.C.Cir.1987).

The Commission's staff reviews only the application selected by lottery to ensure that it is acceptable for filing—that is, that it complies with FCC rules, regulations, and other requirements. 47 C.F.R. § 22.20(a)(2). If the application does not meet the standards for acceptability, it is dismissed without further consideration. If, however, it is acceptable, it is placed on public notice as the tentative selectee, offering unsuccessful applicants the opportunity to challenge the application. *Lottery Further Reconsideration Order,* 59 Rad.Reg.2d (P & F) at 410.

To speed the selection process, Commission rules prohibit the filing of amendments to cellular applications until after a qualified tentative selectee has been announced for a particular market. Only tentative selectees may file amendments, and only minor amendments are permitted. *Cellular Lottery Order,* 98 F.C.C.2d at 220; 47 C.F.R. § 22.918(b). Applicants filing defective applications therefore have no opportunity to file amendments either before or after the lottery to bring applications into compliance with acceptability criteria should they prevail in the lottery. *Lottery Further Reconsideration Order,* 59 Rad.Reg.2d (P & F) at 410 n. 17; *see also, e.g., REM Communication,* 3 F.C.C.R. 3705 (1988).

In the consolidated appeals before us, appellants, seventeen disappointed cellular applicants, challenge the FCC's decisions dismissing their applications upon discovery that each proposed to operate its licensed radio common carrier facility with one or more general partners who were aliens. The Commission held that the applications violated section 310(b)(3) of the Communications Act, prohibiting the grant of radio licenses to aliens and to corporations having a certain level of alien ownership or having aliens as officers or directors. 47 U.S.C. § 310(b)(3) (1988), incorporated in section 22.4 of the FCC's rules. 47 C.F.R. § 22.4(b)(3) (1993).

## B. *Proceedings Below*

In the earliest of these proceedings, Continental Cellular, appellant in case No. 91–1621, applied for a cellular radio facility on the nonwireline frequency to service the Alaska 2 (Bethal) Rural Services Area

("RSA"), on July 15, 1988. Like all the appellants, Continental certified that it had complied with the requirements of section 310(b) of the Communications Act and section 22.4(b) of the Commission's rules. Its application was selected in the lottery. *See* PN Rep. No. CL–88–168 (F.C.C. released Sept. 27, 1988). The Commission's Mobile Services Division Staff examined Continental's application and rejected it as unacceptable for filing because Continental had proposed to operate as a general partnership with at least three alien general partners in violation of section 310(b)(3) of the Act and section 22.4(b)(3) of the FCC rules. The Commission denied reconsideration of the dismissal, holding that the staff had properly concluded that the inclusion of aliens as general partners violated the prohibitions of section 310(b)(3). The FCC also rejected Continental's argument that alien general partners could exempt themselves from the statutory restrictions by accepting a partnership agreement purporting to insulate them from the management of partnership affairs, and concluded that even if such an exemption were permissible, Continental's partnership agreement was insufficient to establish such insulation. *Continental Cellular I,* 5 F.C.C.R. at 691–92.

With its petition for reconsideration, Continental submitted an amendment seeking to change its general partnership to a limited partnership with the alien partners becoming limited partners. The Commission held that Continental's application could not be amended to comply with alien ownership rules, as it had properly been found defective and unacceptable for filing. 5 F.C.C.R. at 693 n. 9, (citing 47 C.F.R. § 22.918(b) and *REM Communication,* 3 F.C.C.R. 3705). Continental appealed the FCC's order to this court, which remanded the case to the Commission for further consideration of the record at FCC's request.

In the interim, each of the other appellants was named the tentative selectee for a market in which it had won the lottery. Each, however, had filed as a general partnership, including between one and four alien partners. Following the lotteries, each sought to file a curative amendment to change its gen-

eral partnership to a limited partnership or to remove the alien general partners.[2] As it had with regard to the Continental application, the staff dismissed the other applications as ineligible for filing, because they had proposed ownership structures that did not comply with the requirements of section 310(b)(3) and section 22.4(b)(3) of the FCC's rules.

Continental and the other appellants petitioned for reconsideration. The Commission consolidated their cases with Continental's. *Continental Cellular II,* 6 F.C.C.R. 6834, 6835 (1991). The FCC refused to reconsider the dismissals, holding that appellants' applications properly were dismissed as unacceptable for filing. It ruled that the inclusion of aliens as general partners as originally proposed violated section 310(b)(3), whether or not alien general partners purported to insulate themselves from management of partnership affairs, and that even were such a statutory exemption permissible, none of the applicants had made a showing of such insulation. Likewise, the Commission rejected contentions of some appellants that dismissal of the applications denied them their Fifth Amendment right to equal protection regardless of alienage. Finally, the FCC declined to accept amendments curing the violation of section 310(b)(3), holding that under clear Commission rules and precedent, curative amendments may not be submitted for a defective cellular application. 6 F.C.C.R. at 6836, (citing *Progressive Cellular III B–2,* 5 F.C.C.R. 2772 (1990)); *REM Communication,* 3 F.C.C.R. 3705 (1988).

## II.

Section 310(b) prohibits the grant of radio licenses, including licenses in the common carrier service, to aliens and to corporations evidencing specific levels of alien ownership or control. Section 310(b)(3) forbids the grant of a radio license to any corporation in which an officer or director is an alien, or of which more than twenty percent of the stock is owned or voted by aliens. The Commission adopted the statutory language verbatim in its rules governing mobile radio services, including the cellular service. 47 C.F.R. § 22.4. These alien ownership restrictions reflect a long-standing determination to "safeguard the United States from foreign influence" in broadcasting. *Kansas City Broadcasting Co.,* 5 Rad.Reg. (P & F) 1057, 1093 (1952). This policy against allowing aliens to have any controlling influence in a licensee was established long before the applications at issue were filed. No less well established is the tenet of partnership law that a general partner has control of partnership affairs as against the outside world. Section 9(1), Uniform Partnership Act; *Picone v. Comm'l Paste Co.,* 215 Miss. 114, 60 So.2d 590 (1952). Although the language of section 310(b) and the corresponding rule refers to corporations only, the statutory restrictions have been extended to noncorporate entities and associations. In *Wilner and Scheiner,* 103 F.C.C.2d 511 (1985), *recon. in part,* 1 F.C.C.R. 12 (1986) ("*Wilner & Scheiner Reconsideration Order*"), the FCC applied the alien ownership restrictions of section 310(b) to limited partnerships and other types of partnership and corporate interests. In that decision, the FCC held that for purposes of section 310(b), the position occupied by general partners in a partnership is directly comparable to that of officers and directors in a corporation, *see* 103 F.C.C.2d at 520 n. 3; therefore, alien general partners are in a position to exercise foreign influence in broadcast media, in contravention of the national security policy underlying the statute.

Although broadcast radio stations were the dominant medium when the national security policy underlying section 310(b) was developed, the rationale is equally applicable to common carrier radio stations, as they, also, are part of the nation's communi-

---

**2.** Unlike the other appellants, Quadrangle Communications did not convert to a limited partnership because its only alien general partner died after its original application had been filed. Instead, Quadrangle amended its application to reflect the fact of the partner's death, and requested a waiver of section 22.922 of the Commission's rules, 47 C.F.R. § 22.922, to permit an involuntary transfer of the deceased partner's interest to the non-alien executrix of the partner's estate. Though the FCC subsequently remanded Quadrangle's application, because Quadrangle, like the other appellants, failed to conform with the Commission's "letter-perfect" cellular application processing rules and procedures, we vacate the remand and deny Quadrangle's appeal.

cations network. Despite their concession that "the national security purpose of Section 310(b) can be a legitimate reason for discrimination against aliens," Pet.Br. at 37, appellants assert a constitutional claim that this court should extend a strict standard of review to distinctions based on alienage. We disagree.

Supreme Court precedent instructs that classifications based on alienage in federal statutes are permissible so long as the challenged statute is not a "wholly irrational" means of effectuating a legitimate government purpose. *Mathews v. Diaz*, 426 U.S. 67, 83, 96 S.Ct. 1883, 1893, 48 L.Ed.2d 478 (1976). In *Mathews*, the Court unanimously upheld denial of Medicare benefits to certain aliens. Similarly, in *Foley v. Connelie*, 435 U.S. 291, 98 S.Ct. 1067, 55 L.Ed.2d 287 (1978), the Court held that a state statute limiting membership in the state police force to U.S. citizens did not violate the Equal Protection Clause of the Fourteenth Amendment. In upholding the legislation, the Court made clear that it had "never suggested that [legislation imposing restraints on aliens] is inherently invalid, nor have we held that all limitations on aliens are suspect." *Id.* at 294, 98 S.Ct. at 1069. Instead, the Court explained, the application of strict scrutiny to the exclusion of aliens as a class has been limited to "exclusions [which] struck at the noncitizens' ability to exist in the community" by denying them essential welfare assistance, educational benefits, or the right to engage in public employment or the practice of licensed professions. *Id.* at 295, 98 S.Ct. at 1070.[3] The opportunity to own a broadcast or common carrier radio station is hardly a prerequisite to existence in a community. Therefore, we apply a rational basis, review rather than a strict scrutiny test.

■ The national security policy satisfies the requirement that there be a "showing of some rational relationship between the interest sought to be protected and the limiting classification." *Id.* at 296, 98 S.Ct. at 1070. We thus deny appellants' constitutional claim.

Appellants next turn to statutory claims. In analyzing their arguments, we use the framework of inquiry laid out in *Chevron U.S.A. Inc. v. Natural Resources Defense Council*, 467 U.S. 837, 842–43, 104 S.Ct. 2778, 2781, 81 L.Ed.2d 694 (1984). "If the intent of Congress is clear, that is the end of the matter.... [I]f [however] the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute."

■ Appellants first argue that the Commission's practices deviate from the plain meaning of section 310(b). They assert that because the statute specifically bars aliens from "holding" licenses, the statute permits aliens to *apply* for them. Thus, they argue, in dismissing their applications, the FCC improperly interpreted and relied on section 310(b) of the Communications Act. Appellants' attempted plain meaning argument rests on a *non sequitur*. The statute's prohibition on aliens holding licenses cannot sensibly be construed to plainly, or even likely, grant permission for aliens to file license applications. It would avail appellants little to have the right to file a licensing application when they could not, because of their composition, hold a license were it awarded to them.

Nor can appellants credibly claim to have been unfairly surprised by the FCC interpreting the presence of alien general part-

---

3. We note that *Foley* involves state, rather than federal, regulation of aliens. Even so, for the purposes of this case, that fact represents a distinction without a difference. The denial of Medicare benefits which survived the rational basis test in *Mathews* could well withstand the *Foley* analysis, which applied strict scrutiny to "exclusions [which] struck at the noncitizens' ability to exist in the community," 435 U.S. at 295, 98 S.Ct. at 1070, based on the Court's conclusion that such exclusions were "inconsistent with the congressional determination to admit the alien to permanent residence." *Id.* In fact, the facets of community life from which aliens may not be excluded, including eligibility for public employment, educational benefits, or "welfare assistance essential to life itself," are those that, if withheld, would directly cause economic dependence or physical harm. In contrast, receipt of Medicare benefits, while desirable, might legitimately be considered a perquisite of citizenship, insofar as a government's decision not to extend such benefits to aliens does not necessarily involve withholding of essential welfare assistance, as would, for example, the denial of food stamps or emergency services at a hospital.

ners in their organization as violations of section 310(b)(3); *Wilner and Scheiner* extended the Communications Act's prohibition of the grant of broadcast licenses to corporations with aliens serving as officers or directors to partnerships with aliens serving as general partners.

■ In light of the foregoing, it is clear that a ban on alien ownership exists; what is lacking is a clear direction from Congress as to the point at which the FCC will effectuate the ban. Under the second step of *Chevron,* that decision belongs to the agency provided only that its interpretation is a reasonable one, consistent with the statute. Here, it is clear that the Commission's regulatory scheme is entirely consistent with the congressional mandate embodied in section 310(b), as tested by the *Chevron* analysis.

The FCC intended the cellular lottery process as a quick, simple method for selecting prospective licensees. *See Cellular Lottery Order,* 98 F.C.C.2d at 179–82, 219–22; *Cellular Lottery Further Reconsideration,* 59 Rad.Reg.2d (P & F) at 409. Under these cellular application processing rules and procedures, the Commission properly concluded that an application that does not comply with all the rules and requirements, including both procedural and substantive requirements relating to the filing and content of the application, must be dismissed.

The procedures set out by the Commission indicate that compliance was an important element in the FCC's decision to announce a successful applicant as the tentative selectee. *See* 47 C.F.R. § 22.20(a); *Cellular Lottery Order,* 98 F.C.C.2d at 195. In amending section 22.918(b) to "strictly limit[ ] the filing of amendments to applications . . . under lottery selection procedures," *id.* at 220, the Commission barred amendments throughout the application process, and limited subsequent amendments to those intended to correct minor errors or omissions in otherwise qualified applications. Prior Commission decisions support this interpretation. *See, e.g., REM Communication,* 3 F.C.C.R. 3705; *Progressive Cellular III B–2,* 5 F.C.C.R. 2772, 2773 (1990). Indeed, appellants present no evidence suggesting that the Commission ever has allowed applicants to file amendments to establish their basic qualifications to become licensees.

Nor can appellants prevail by arguing that the FCC offered insufficient notice that applications violating section 310(b) of the Act and section 22.4 of the FCC rules were unsuitable for filing and would be dismissed. Taken together, the rule governing acceptability, 47 C.F.R. § 22.20(a)(2), and the rule governing acceptance of amendments to applications, 47 C.F.R. § 22.918(b), alerted prospective applicants that they had to possess the qualifications to be a licensee on the day of filing, that one such qualification was compliance with section 310(b), and that no curative amendments would be accepted for noncomplying applications. This notice was all that was necessary.

■ Thus, there is no support for appellants' contention that the Commission erred in not exempting from section 310(b)(3) partnerships in which alien general partners contractually relinquish control and management. Aside from the deviation from the "letter-perfect" rule that such an exception would entail, appellants have failed to show that the FCC was unreasonable in concluding that it had no power to accord an exemption to individuals holding positions otherwise subject to section 310(b) simply because they agree not to exercise the power of their positions. *Continental Cellular I,* 5 F.C.C.R. at 692; *Continental Cellular II,* 6 F.C.C.R. at 6836; *Wilner and Scheiner Reconsideration Order,* 1 F.C.C.R. at 14–15. Appellants cannot successfully defend their contention that they effectively cured the violation simply by ensuring that the alien partners could not control the partnership. Even as a practical matter, though the proffered partnership agreements vested day-to-day control in a single managing partner, they neither excluded alien general partners from involvement in the management or operation of the partnership, nor precluded an alien from holding the position of managing partner. In these circumstances, the FCC could reasonably conclude that the proposed agreements were insufficient to remove the alien general partners from the restriction of section 310(b)(3), even assuming such an exemption were available. *Continental Cellular II,* 6 F.C.C.R. at 6836.

When Congress has intended to give the Commission discretion to depart from a spec-

ified level of control in section 310(b), it has spoken explicitly. *See* 47 U.S.C. § 310(b)(4). The absence of such plain language here only supports the FCC's interpretation.

## CONCLUSION

The FCC's rules and regulations for selection of cellular licensees made clear that all applications had to qualify for selection before any amendments would be allowed. Because each appellant before us listed an alien as a general partner in the first instance, in violation of the Commission's rules implementing section 310(b) of the Communications Act, their applications did not qualify for selection on the date of filing and therefore could not be awarded. The Commission was well within its authority to dismiss the applications, and we therefore affirm its order.

*It is so ordered.*