Jose CHAVEZ–SALIDO, Ricardo Bohorquez, and Pedro Luis Ybarra, Plaintiffs,

v.

Clarence E. CABELL, in his official capacity as Acting Chief Probation Officer of Los Angeles County; Jacqualine Hasentab, in her official capacity as Personnel Officer for the Los Angeles Probation Department; Gordon T. Nesvig, in his official capacity as Chief Personnel Officer for the County of Los Angeles; and the County of Los Angeles, a body politic, Defendants.

No. CV 76–541–IH.

United States District Court, C. D. California.

June 4, 1980.

Richard A. Paez, Legal Aid Foundation of Los Angeles, Los Angeles, Cal., Michele D. Washington, Western Center on Law and Poverty, Inc., Los Angeles, Cal., for plaintiffs.

John H. Larson, County Counsel, Eric R. Young, Deputy County Counsel, Los Angeles, Cal., for defendants.

Before PREGERSON,[*] Circuit Judge, CURTIS, Senior District Judge, and IRVING HILL, District Judge.

OPINION

IRVING HILL, District Judge:

In an opinion filed February 3, 1977, and published at 427 F.Supp. 158 (C.D.Cal.1977), this Court declared unconstitutional California Government Code Section 1031(a). That section provides that one must be a citizen of the United States to be a peace officer or to occupy any governmental position, state, county, or local, which is declared by law to have the powers of a peace officer. Plaintiffs in the case are three non-citizens, each of whom sought employment by Defendant Los Angeles County as a Deputy

*Vice Hon. Stanley N. Barnes, Senior Circuit Judge, who was a member of the original court, but who recused himself from participating in the instant rehearing because of illness.

Probation Officer II and was refused employment solely because of the citizenship requirement of the statute.

This Court's decision was appealed to the United States Supreme Court. In an order dated May 15, 1978, the judgment of this Court was vacated and the case was remanded to this Court "for further consideration in light of *Foley v. Connelie*, 435 U.S. 291, 98 S.Ct. 1067, 55 L.Ed.2d 287 (1978)." 436 U.S. 901, 98 S.Ct. 2228, 56 L.Ed.2d 398 (1978). The matter was rebriefed and was reargued on December 8, 1979.

The facts are fully set forth in the original opinion of this Court and do not need repetition here. We likewise will not repeat herein the jurisdictional discussion of the original opinion, which we readopt.[1] In the footnote [2] we discuss the few inconsequential factual changes occurring since the original opinion was filed.

We recognize that the views of the Supreme Court with respect to the general problem of citizenship being required for employment by state and local government agencies, have been much more fully developed and expounded in two recent cases: *Foley v. Connelie, supra* and *Ambach v. Norwick*, 441 U.S. 68, 99 S.Ct. 1589, 60 L.Ed.2d 49 (1979).[3]

Applying the newly developed principles enunciated in *Foley* and *Ambach*, we have reached the same result as we reached before. We again hold that Section 1031(a) is unconstitutional. We reach this same result on the same grounds as before: 1) the statute is overbroad and 2) the statute as applied denies these plaintiffs the equal protection of the law.

## I

## OVERBREADTH

■ In our original opinion, we discussed the status of alienage under the equal protection clause as enunciated by the Supreme Court. We believe that discussion remains valid today. Nothing in the intervening opinions of the Supreme Court would in our view undermine the proposition that citizenship may be required for governmental employment only by a statute which is "narrowly drawn" and which does not sweep "too broadly."

Footnote 5 of the *Foley* opinion, 435 U.S. at 296, 98 S.Ct. at 1071, reaffirms the continued validity of the overbreadth criterion in the following language:

> This is not to say, of course, that a State may accomplish this end with a citizenship restriction that 'sweeps indiscriminately', [citing *Sugarman v. Dougall*, 413 U.S. 634, 93 S.Ct. 2842, 37 L.Ed.2d 853] without regard for the differences in the positions involved.

1. At the second argument, counsel for Plaintiffs asked to be relieved of their prior action in which they voluntarily waived any claim against the County under 42 U.S.C. Section 1983. They point to the intervening opinion of the Supreme Court in *Monell v. Dept. of Soc. Serv. of City of N. Y.*, 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978), as having changed the previous law. As we understand their papers, defendants do not dispute the County's § 1983 liability under *Monell*. At this late date, we decline to relieve counsel of their previous waiver, noting that under our previous holding the County is amenable to suit under § 1981 and that a § 1983 remedy would be cumulative at best.

2. As to the functions and powers of probation officers, the parties stipulated that probation officers in California are not authorized to carry weapons. In addition, this Court took judicial notice of certain sections of California law defining the powers and functions of probation officers, which sections were not mentioned in the previous opinion, i. e., Code of Civil Procedure §§ 131.3 et seq.; Penal Code §§ 1203 et seq.; Welfare and Institutions Code § 280–83, 727 et seq. We do not regard any of these sections as working any material change in the description of the duties of probation officers as contained in the original opinion.

The Court was also informed that since the publication of its original opinion, Plaintiff Chavez-Salido has left County employment altogether and no longer seeks injunctive relief with reference to appointment. However, his case is not rendered moot by that fact since his prayers for back pay and attorneys' fees remain viable.

3. The Supreme Court has also spoken on the same subject in *Nyquist v. Mauclet*, 432 U.S. 1, 97 S.Ct. 2120, 53 L.Ed.2d 63 (1977), but we do not regard that opinion as of importance for our purposes, as it does not discuss the governmental function classification, *see infra*.

In *Foley*, the statute requiring citizenship was narrowly drawn. It applied only to members of the New York State Police force, "State Troopers." In *Norwick* the statute was likewise narrowly drawn. It applied only to persons who are employed "to teach in the public schools" of the state. It is noteworthy that the New York statute involved in *Norwick* did not confine employment as teachers to those who had their citizenship, but permitted the employment of non-citizens who had "made application" to become citizens. The California statute with which we deal permits the employment only of persons who are already citizens and, as we pointed out in our original opinion, covers a whole host of other occupations to which the requirement of citizenship cannot be reasonably related.

We read the new decisions of the Supreme Court as continuing to emphasize that the legislature must make a reasoned judgment as to each occupation in the field of public employment for which it requires citizenship as a prerequisite. The Court's opinions seem to require that the legislature should examine the functions, duties and responsibilities of various public jobs, position by position, and determine for each that the job is so necessarily involved with the essential power of government that it should be confined to citizens.

If these are the requirements, the legislative action of the California legislature with which we are concerned does not meet them. The California legislature has for over one hundred twenty-five years dealt with the subject of who is a peace officer and who, additionally, is deemed to have the powers of a peace officer. The first enactments in this field appear to go back to 1851.[4] In dozens of subsequent enactments, the legislature had added one or more public positions to the list. Until 1961, all the repeated additions to the list of peace officers were enacted without any requirement that people holding these positions should be citizens.[5] Then in 1961, in one fell swoop, the legislature passed Government Code Section 1031 which applied the mandatory citizenship requirement to all of the positions on the list. We are cited no legislative history or legislative findings which supply any basis or rationale for this broad new citizenship requirement.

In Footnote 22 of our prior opinion, we set forth the extensive list of positions covered by the California citizenship requirement of Section 1031(a). It is to be remembered that state, county, and local employees are all included if they are within any of the occupational categories on the list. We believe that Section 1031(a) is void as a law requiring citizenship which "sweeps too broadly" under the Court's original holding in *Sugarman* and the recent Footnote 5 in *Foley*. There appears to be no justification whatever for excluding aliens, even those who have applied for citizenship, from holding public employment as cemetery sextons, furniture and bedding inspectors, livestock identification inspectors, and toll service employees.[6] Yet all these are within the pro-

---

4. *See Hetherington v. Cal. State Personnel Board*, 82 Cal.App.3d 582, 147 Cal.Rptr. 300, 309 (1978) (Reynoso, J., dissenting). Originally, only four positions were granted peace officer status: sheriff, policeman, marshal, and constable. *Id.*

5. We note that the California Attorney General found no pre-1961 citizenship requirements for peace officers in his study of this matter. See Opinion No. 69–199, 53 A.G.Op. 63, 68, (1970).

6. We note that since the publication of our original opinion, the California legislature has added a substantial number of other positions to the list appearing as Footnote 22 of the original opinion, and has deleted a few positions from that list. In the interest of accuracy, the changes are hereinafter specified:

*Under § 830.1*
Add: Inspectors and Investigators in Offices of District Attorney
*Under § 830.2*
Add: Bay Area Rapid Transit District officers
*Under § 830.3*
Add: Narcotics agents of the Department of Justice
Add: Investigators of the State Department of Health
Delete: District Attorney investigators
Delete: "members of a fire department"
*Under § 830.31*
Add: Marshals and police appointed by the Director of Parks and Recreation
*Under § 830.35*
Add: Policemen of the San Francisco Port Commission

scription of Section 1031(a) along with probation officers.

As will be discussed more fully in part II, *infra*, certain positions within the "political community" are subject to a less stringent equal protection scrutiny than those positions not within the "political community." For the purposes of this overbreadth analysis, it suffices to say that cemetery sextons, toll collectors, and persons in many other occupations within Section 1031(a) cannot be considered members of the political community no matter how liberally that category is viewed.

Thus, nothing has changed which would alter our original conclusion: Section 1031(a) is grossly overbroad and sweeps much too broadly in its proscription of alien employment.

## II

## THE STATUTE AS APPLIED

In their rebriefing and reargument, defendants again urge us to restrict our examination only to the validity of the statute as applied to deputy probation officers.[7] Defendants have pointed to nothing in the recent opinions of the Supreme Court which would justify such a limited examination. We therefore again observe that the decisions of the Supreme Court appear to rule out consideration of such a statute as applied. We again determine that the scrutiny to be afforded a statute of this kind must include an examination of whether it is too broad in its scope. This is the approach which the Supreme Court itself undertook in *Sugarman*, and, as indicated by the footnote in *Foley*, remains the proper approach to this day. But, out of an abundance of caution, we have again proceeded to examine Section 1031(a) as applied. We again hold the statute to be unconstitutional as applied to deputy probation officers as their functions and powers are defined in California law.

This examination of the statute as applied requires us to determine whether deputy probation officers fall within the group of public service positions which the states and local governments may reserve for American citizens. That group of positions was originally described in *Sugarman* as involving "members of the political community." The characteristics of positions which fall within the group have been more fully expounded in *Norwick* and *Foley*.

In *Norwick*, which held that school teachers are within the political community, the Court rests the decision upon the important policy and governmental functions which public school teachers perform.

*Under § 830.36*
Add: Police officers appointed by the Bethel Island Municipal Improvement District
　*Under § 830.4*
Add: Airport security officers of the City of Palm Springs
Add: Transit police officers of the Southern California Rapid Transit District
　*Under § 830.10*
Add: County coroners and deputy coroners
　*Under § 830.11*
Add: Welfare fraud investigators or inspectors, if designated by local ordinance
　*Under powers of peace officers:*
Delete: The director, officers and employees of the Division of Aeronautics (Public Utilities Code § 21252)
Delete: Any person vested with the power of enforcing any provisions of the Agriculture Code (Agriculture Code [now Food & Agriculture Code] § 7)
Delete: Inspectors of the Bureau of Livestock Identification (Agriculture Code [now Food & Agriculture Code] § 20432)

Delete: Officers and employees of the state park system (Public Resources Code § 5008)

Delete: Sealers of the Department of Weights and Measures (Business and Professions Code § 12013)

7. Defendants at the reargument made a contention not previously advanced by them, i. e., that these plaintiffs are confined to challenging the validity of § 1031(a) only as it applies to probation officers, and have no standing to challenge the validity of the statute as it applies to other occupations. We reject this contention. Under standard equal protection analyses, and under the explicit approach of the Supreme Court in *Sugarman*, where there is a suspect classification, i. e., non-citizens, anyone affected by the statute would appear to have standing to challenge the statute on overbreadth grounds. This argument is really no different from that defendants made with respect to overbreadth, and we reject it for the same reasons as found in that section of our opinion.

The Court specifically relied on the importance of public education in our society, 441 U.S. at 76–78, 99 S.Ct. at 1594–1595, and noted that the function of a schoolteacher is of paramount importance because it includes promoting civic virtues, serving as a role model, and influencing the students' attitudes towards government and the political process, *id.* at 78–80, 99 S.Ct. at 1595–1596.

We find no difficulty in holding that the function of deputy probation officers is substantially distinguishable. Probation officers do not deal with the bulk of the community. They perform no school teaching functions with respect either to children or adults. The relationship of probation officers to those under their supervision is far different from the relationship of a public school teacher to his pupils. The effect of probation officers on the governmental and political process is, we believe, far, far less.

In *Foley* the Court held that New York State Troopers were within the political community. The underlying reason was expressed as follows:

> [I]t is because this country entrusts many of its most important responsibilities to these officers . . . [I]t represents the choice, and right, of the people to be governed by their citizen peers. To effectuate this result, we must necessarily examine each position in question to determine whether it involves discretionary decision making, or execution of policy, which substantially affects members of the political community.

435 U.S. at 296, 98 S.Ct. at 1071.

The role of the State Troopers was also described in *Foley* as one involving "a very high degree of judgment and discretion, the abuse and misuse of which can have serious impact on individuals," 435 U.S. at 298, 98 S.Ct. at 1072, and as involving persons who are "vested with . . . plenary discretionary powers." *Id.*

Both State Troopers and deputy probation officers are generally regarded as being part of the law enforcement apparatus of the community. We have carefully compared the powers and duties of both with particular reference to the above quoted language. In so doing, we have, as required by the teachings of the Supreme Court, given great weight and respect to the determination of the state legislature in requiring citizenship as a condition of employment. But we have nevertheless concluded that the positions are vastly different and that a constitutionally permissible basis does not exist for such a citizenship requirement for deputy probation officers.

The *Foley* opinion, in describing the role of the State Trooper, emphasizes that he is involved in formulating and executing broad public policy, that he deals with the whole community, and that his actions immediately affect the lives of citizens in all walks of life. It also emphasizes that he is "clothed with authority to exercise an almost infinite variety of discretionary powers." 435 U.S. at 297, 98 S.Ct. at 1071.

We contrast this with the role of a probation officer in California. In the original opinion we described the probation officer's powers and duties in the following language:

> Deputy probation officers in California perform a wide range of duties. They include preparation of presentence investigations and recommendations as to sentence, supervision of probationers (including efforts to ameliorate their employment, health and family problems) and investigation of probation violations. Also included are various duties in connection with juveniles and juvenile courts among which are the filing of juvenile court petitions charging both delinquency and illegal acts, presence at juvenile court hearings in an advisory capacity, placement of minors declared to be wards of the juvenile court and supervising custodial personnel in juvenile incarceration institutions.

For the purposes of this remand, we have given even more careful and detailed consideration to those powers and duties.

No single section of California law spells out in detail all or substantially all of the

duties of a probation officer. Bits and pieces of his powers are found in a number of statutes. Some of them may be thought to involve wide and important discretion and authority. For example, a probation officer may arrest a probationer believed to have violated the terms of his probation for the purpose of bringing the probationer before a court. The Court may thereafter, in its discretion, issue a warrant permitting further detention. Penal Code Section 1203.2(a). This limited power of arrest contrasts sharply with the general powers of arrest possessed by State Troopers and even ordinary policemen.

With respect to juveniles, a probation officer, under California Welfare and Institutions Code Section 628, acts as the custodian of a juvenile taken into custody by the police. After making an investigation, the probation officer has the discretion either to release the juvenile to his parents or retain him in custody. The custody will be only for a very short period pending a court hearing. The essential decision on the subject of custody is thus a judicial one in which the probation officer is but an advisor to the court.[8]

In *Foley* the Court described State Troopers as exercising the functions traditionally associated with peace officers, i. e., the prevention and detection of crime, apprehension of suspected criminals, execution of warrants, search and seizure for arrest, and the carrying of weapons, 435 U.S. at 293, 98 S.Ct. at 1069. A California probation officer cannot be said to perform any of those functions except perhaps a limited power of arrest.

Whereas California law gives policemen the many powers mentioned above (Penal Code Section 830.1), the section which confers the status of peace officers on California probation officers (Penal Code Section 830.5) contains words of extreme limitation on the powers of the latter. We read the relevant sections of the Penal Code as allowing a probation officer to act like a policeman only in enforcing compliance by a probationer of the conditions of his probation and in the transportation of a probationer.[9] Moreover, as we point out in Footnote 1, *supra*, the California legislature does not allow probation officers to carry weapons, which right is indispensable to the function of State Troopers, policemen, and others truly having the powers of a peace officer.

When the functions and powers of a California probation officer are compared side by side with those of a New York State Trooper or any other policeman, the differences are noteworthy. The probation officer's position involves some discretion to be

8. The Supreme Court has recently considered the role of a California probation officer in the case of *Fare v. Michael C.* 442 U.S. 707, 99 S.Ct. 2560, 61 L.Ed.2d 197 (1979). In that case the question before the Court concerned a minor who, during interrogation by the police, had asked to see a probation officer who had supervised him in other juvenile court problems. No meeting with the probation officer was arranged and the interrogation continued. In the interrogation, the juvenile made damaging admissions which he sought to suppress from the juvenile court proceedings on the ground that the *Miranda* rule had been violated. The California Supreme Court had upheld the juvenile's contention and likened the function of a probation officer to that of an attorney; a request to see an attorney would require an end to all questioning. The Supreme Court reversed, pointing out that a probation officer has no specialized legal training and has a duty of loyalty to the state, under which he could not withhold, from the police or the courts, facts made known to him by the juvenile as to a crime then under investigation. The undisputed existence of a probation officer's duties to the state for this purpose does not in our view make the probation officer the equivalent of a policeman. The opinion of the Court was directed to matters other than the governmental function exception in the field of alienage with which we are dealing in this case.

9. Section 830.5 encompasses the recognition of both probation officers and state parole officers as peace officers. Probation officers are appointed by the county, while parole officers are employed by the State Department of Corrections. We read § 830.5(a)(2), authorizing action in connection with the escape of any inmate from a state institution, to be applicable to parole officers only, and we also read § 830.5(a)(1) where it refers to parolees to be describing only the authority of parole officers. A contrary interpretation would not in any way change today's result.

sure, but the discretion is far less important than the policeman's since the probation officer's decisions lack finality and are made advisory to and under the supervision of a judicial officer.

Thus, a probation officer's duties involve substantially less discretion and responsibility than either a schoolteacher's or a policeman's. Just as important is the impact of each employee on the public at large. Public schoolteachers see a great majority of children and are with them many hours of each day through their formative years. Policemen deal with the entire community. Probation officers, on the other hand, deal only with a limited number of persons who have had prior adverse contact with the judicial system. Thus, in terms of the breadth of their constituency and the width of the group they serve, there is in our view a vast distinction between public schoolteachers and policemen on the one hand and probation officers on the other.

For the reasons stated above, we hold that the position of deputy probation officer is not within the political community. Therefore, we must apply the strict scrutiny standard and determine if a compelling state interest exists. In so doing, we reach the same result as we reached in the original opinion and hold that citizenship may not be required for the position of Deputy Probation Officer.

### III

### RELIEF

In view of our reaching the same result as reached in the original opinion, the relief decreed will be the same except that the injunctive relief will not be applicable to Plaintiff Chavez-Salido. See Footnote 2, *supra*. We note that the single judge to whom the case was originally assigned, Judge Hill, awarded attorneys fees to the Plaintiffs. We ratify that award and authorize him to award such further attorneys' fees in connection with the appeal, remand, rebriefing, and reargument as he deems appropriate. We also authorize the single judge, Judge Hill, to sign and file a final judgment in the case. Counsel for Plaintiffs will prepare and submit a proposed final judgment within 10 days. If the form of the proposed final judgment is not approved by defense counsel, the latter will have 10 days further in which to file written objections which will not change the result.

PREGERSON, Circuit Judge, concurs in this opinion.

CURTIS, Senior District Judge, dissenting:

In our first opinion filed February 3, 1977, we declared section 1031(a) of the California Government Code unconstitutional (1) as overbroad, and (2) in violation of the Equal Protection Clause as applied to the plaintiffs herein. Upon appeal, the Supreme Court has remanded the case "for further consideration in the light of *Foley v. Connelie*, 435 U.S. 291, 98 S.Ct. 1067, 55 L.Ed.2d 287 (1978)."

### I. FACIAL OVERBREADTH CHALLENGE

Since *Foley* does not touch on the issue of "overbreadth," if the Supreme Court had accepted our holding on this issue, I would think it would have simply affirmed our decision, at least upon the issue of overbreadth, and that would have been the end of the matter.

But, since it did not do so, and upon remand directs our attention to the issues with which *Foley* was concerned and no others, I can only conclude that the Supreme Court did not agree with our holding on the issue of overbreadth.

Furthermore, it seems clear to me that plaintiffs would have no standing to challenge the statute as overbroad merely because it included categories of persons not before the court to which plaintiffs did not belong, but as to which the application of the statute might produce an unconstitutional result.

In support of my position I rely upon the Court's statement in *United States v. Raines*, 362 U.S. 17, 20–21, 80 S.Ct. 519, 4 L.Ed.2d 524 (1960):

"The very foundation of the power of the federal courts to declare Acts of Congress unconstitutional lies in the power and duty of those courts to decide cases and controversies properly before them. This was made patent in the first case here exercising that power—'the gravest and most delicate duty that this Court is called on to perform.' *Marbury v. Madison*, 1 Cranch 137, 177–180, 2 L.Ed. 60. This Court, as is the case with all federal courts, 'has no jurisdiction to pronounce any statute, either of a State or of the United States, void, because irreconcilable with the Constitution, except as it is called upon to adjudge the legal rights of litigants in actual controversies. In the exercise of that jurisdiction, it is bound by two rules, to which it has rigidly adhered, one, never to anticipate a question of constitutional law in advance of the necessity of deciding it; the other never to formulate a rule of constitutional law broader than is required by the precise facts to which it is to be applied.' *Liverpool, New York & Philadelphia S.S. Co. v. Commissioners of Emigration*, 113 U.S. 33, 39, 5 S.Ct. 352, 28 L.Ed. 899. Kindred to these rules is the rule that one to whom application of a statute is constitutional will not be heard to attack the statute on the ground that impliedly it might also be taken as applying to other persons or other situations in which its application might be unconstitutional. *United States v. Wurzbach*, 280 U.S. 396, 50 S.Ct. 167, 74 L.Ed. 508; *Heald v. District of Columbia*, 259 U.S. 114, 123, 42 S.Ct. 434, 66 L.Ed. 852; *Yazoo & Mississippi Valley R. Co. v. Jackson Vinegar Co.*, 226 U.S. 217, 33 S.Ct. 40, 57 L.Ed. 193; *Collins v. Texas*, 223 U.S. 288, 295–296, 32 S.Ct. 286, 56 L.Ed. 439; *New York ex rel. Hatch v. Reardon*, 204 U.S. 152, 160–161, 27 S.Ct. 188, 51 L.Ed. 415. Cf. *Voeller v. Neilston Warehouse Co.*, 311 U.S. 531, 537, 61 S.Ct. 376, 85 L.Ed. 322; *Carmichael v. Southern Coal & Coke Co.*, 301 U.S. 495, 513, 57 S.Ct. 868, 81 L.Ed. 1245; *Virginian R. Co. v. System Federation*, 300 U.S. 515, 558, 57 S.Ct. 592, 81 L.Ed. 789; *Blackmer v. United States*,

284 U.S. 421, 442, 52 S.Ct. 252, 76 L.Ed. 375; *Roberts & Schaefer Co. v. Emmerson*, 271 U.S. 50, 54–55, 46 S.Ct. 375, 70 L.Ed. 827; *Jeffrey Mfg. Co. v. Blagg*, 235 U.S. 571, 576, 35 S.Ct. 167, 59 L.Ed. 364; *Tyler v. Judges of the Court of Registration*, 179 U.S. 405, 21 S.Ct. 206, 45 L.Ed. 252; *Ashwander v. TVA*, 297 U.S. 288, 347–348, 56 S.Ct. 466, 80 L.Ed. 688 (concurring opinion)."

The same rule was followed in *Broadrick v. Oklahoma*, 413 U.S. 601, 93 S.Ct. 2908, 37 L.Ed.2d 830 (1973), when the Court said at 610, 93 S.Ct. at 522–523:

"Embedded in the traditional rules governing constitutional adjudication is the principle that a person to whom a statute may constitutionally be applied will not be heard to challenge that statute on the ground that it may conceivably be applied unconstitutionally to others, in other situations not before the Court. See, e. g., *Austin v. Aldermen*, 7 Wall. 694, 698–699, 19 L.Ed. 224 (1869); *Supervisors v. Stanley*, 105 U.S. 305, 311–315, 26 L.Ed. 1044 (1882); *Hatch v. Reardon*, 204 U.S. 152, 160–161, 27 S.Ct. 188, 51 L.Ed. 415 (1907); *Yazoo & M. V. R. Co. v. Jackson Vinegar Co.*, 226 U.S. 217, 219–220, 33 S.Ct. 40, 57 L.Ed. 193 (1912); *United States v. Wurzbach, supra*, 280 U.S. at 399, 50 S.Ct. 167; *Carmichael v. Southern Coal & Coke Co.*, 301 U.S. 495, 513, 57 S.Ct. 868, 81 L.Ed.2d 1245 (1937); *United States v. Raines*, 362 U.S. 17, 80 S.Ct. 519, 4 L.Ed.2d 524, 2915 (1960)."

It is true that the Court has recognized some limited exceptions to this rule, but only "because of the most 'weighty countervailing policies.'" *Broadrick, supra*, 413 U.S. at 611, 93 S.Ct. at 2915, *citing Raines, supra*, 362 U.S. at 22–23, 80 S.Ct. at 523. Such exceptions have been applied in most instances to cases in which a holding of unconstitutionality on only one aspect of the statute might have an impact upon persons who are not parties to the action, and who would have no effective avenue of preserving their rights themselves. An exception perhaps most often followed is where courts have been inclined to depart

to some extent from traditional rules of standing so as to permit attacks on overly broad statutes affecting speech and expression which, unless stricken in their entirety, might remain as a threat or deterrent to constitutionally protected expression.

After enumerating the exceptional situations in which the standing has been allowed, the Court said:

"Application of the overbreadth doctrine in this manner is, manifestly, strong medicine. It has been employed by the Court sparingly and only as a last resort. Facial overbreadth has not been invoked when a limiting construction has been or could be placed on the challenged statute. See *Dombrowski v. Pfister,* 380 U.S. 479 at 491, 85 S.Ct. 1116, 14 L.Ed.2d 22; *Cox v. New Hampshire,* 312 U.S. 569, 61 S.Ct. 762, 85 L.Ed. 1049 (1941); *United States v. Thirty-seven Photographs,* 402 U.S. 363, 91 S.Ct. 1400, 28 L.Ed.2d 822 (1971); cf. *Breard v. Alexandria,* 341 U.S. 622, 71 S.Ct. 920, 95 L.Ed. 1233 (1951)."

413 U.S. at 613, 93 S.Ct. at 2916.

In any event, none of the exceptions pointed out in *Broadrick* or *Raines* are applicable in construing section 1031(a), and I would therefore, in reliance upon this rule, deny plaintiffs' standing in this action.

The majority bases its holding of overbreadth upon the concept that the statute "sweeps too broadly" in that it includes occupational categories as to which the application of the citizenship requirement would be clearly unconstitutional. In doing so, it relies upon *Sugarman v. Dougall,* 413 U.S. 634, 635, 93 S.Ct. 2842, 2844, 37 L.Ed.2d 853 (1973), in which the Supreme Court struck down section 53 of the New York Civil Service Law which provided, "no person shall be eligible for appointment for any position in the competitive class unless he is a citizen of the United States." The Court in *Sugarman* recognized the right of the state to exclude non-citizens in occupational categories whose members participate directly in the formation and execution

of government policy, but held that section 53 was so imprecisely and broadly drawn as to include "many positions with respect to which the State's proffered justification has little, if any, relationship." 413 U.S. at 642, 93 S.Ct. at 2847.

By way of explaining its decision, the Court said:

"While we rule that § 53 is unconstitutional, we do not hold that, on the basis of an individualized determination, an alien may not be refused, or discharged from, public employment, even on the basis of noncitizenship, if the refusal to hire, or the discharge, rests on legitimate state interests that relate to qualifications for a particular position or to the characteristics of the employee. We hold only that a *flat ban on the employment of aliens in positions that have little, if any, relation to a State's legitimate interest, cannot withstand scrutiny under the Fourteenth Amendment.* . . .

Neither do we hold that a State may not, in an *appropriately defined class of positions,* require citizenship as a qualification for office."

413 U.S. at 646–47, 93 S.Ct. at 2850 (emphasis added).

The California and New York statutes are clearly distinguishable. The Court found the New York statute to be overbroad because of its failure to define the occupational categories which the state legislature wished to reserve for citizens with that degree of narrowness and precision necessary in order to distinguish between those to whom the statute could be constitutionally applied from those as to whom the statute could not be so applied. The California statute, on the other hand, although it includes a great many different occupational categories, each of these categories are defined with such narrowness and precision as will permit the application of constitutional principles on any category challenged. It is difficult to see how the occupation of probation officer [1] could be more clearly defined.

1. Since the duties of a deputy probation officer are the same as a "probation officer" I make no

distinction between the two in this opinion.

I would hold therefore that section 1031(a) of the California Government Code should be upheld as against an attack for overbreadth.

## II. VALIDITY AS APPLIED

Although the Court has held that state classifications based on alienage are, for purposes of equal protection analysis, "inherently suspect and subject to close judicial scrutiny." (*Graham v. Richardson*, 403 U.S. 365, 372, 91 S.Ct. 1848, 1852, 29 L.Ed.2d 534 (1971)), in *Foley* the Court created a significant exception where certain governmental functions are involved.

"The individual, [upon becoming a citizen], belongs to the polity and is entitled to participate in the processes of democratic decisionmaking. Accordingly, we have recognized 'a State's historical power to exclude aliens from participation in its democratic political institutions,' [*Sugarman v. Dougall*, 413 U.S. 634, 648, 93 S.Ct. 2842, 37 L.Ed.2d 853 (1973)], as part of the sovereign's obligation ' "to preserve the basic conception of a political community." ' 413 U.S., at 647, 93 S.Ct. at 2850.

The practical consequence of this theory is that 'our scrutiny will not be so demanding where we deal with matters firmly within a State's constitutional prerogatives.' [*Sugarman* ], *supra*, at 648, 93 S.Ct. at 2850. The State need only justify its classification by a showing of some rational relationship between the interest sought to be protected and the limiting classification."

435 U.S. at 295–96, 98 S.Ct. at 1070.

In *Ambach v. Norwick*, 441 U.S. 68, 99 S.Ct. 1589, 60 L.Ed.2d 49 (1979), decided after *Foley* and subsequent to remand of the instant case, the *Foley* holding was further clarified. Said the Court:

"The rule for governmental functions, which is an exception to the general standard applicable to classifications based on alienage, rests on important principles inherent in the Constitution. The distinction between citizens and aliens, though ordinarily irrelevant to private activity, is fundamental to the definition and government of a State."

441 U.S. at 75, 99 S.Ct. at 1590.

*Governmental Function Test*

After discussing the limited right of a state to require citizenship for certain positions, the Court provided the following guidelines for determining the applicability of the *Foley* exception to strict scrutiny analysis:

"[W]e must necessarily examine each position in question to determine whether it involves discretionary decisionmaking, or execution of policy, which substantially affects members of the political community."

435 U.S. at 296, 98 S.Ct. at 1071.

In *Ambach*, which involved a challenge to a citizenship requirement for teaching in the public schools, the Court further developed the governmental function test:

"In determining whether, for purposes of equal protection analysis, teaching in public schools constitutes a governmental function, we look to the role of public education and to the degree of responsibility and discretion teachers possess in fulfilling that role."

441 U.S. at 75, 99 S.Ct. at 1594.

Therefore, in determining whether the strict scrutiny or rational basis analysis should be applied, this court must apply the governmental function test to determine: (1) the degree of discretionary decisionmaking afforded probation officers under the system, and (2) the role of the probation system in the governmental structure.

In *Foley*, the Court was confronted with a New York State statute requiring New York State Troopers to be citizens. The Court upheld the statute's citizenship requirement on the ground that such a trooper was a member of the State Police Force, a law enforcement body which exercises broad police authority throughout the state. After discussing in some detail the varying duties which the police are called upon to perform, the Court states:

"Clearly the exercise of police authority calls for a very high degree of judgment and discretion, the abuse or misuse of which can have serious impact upon individuals."

435 U.S. at 298, 98 S.Ct. at 1072.

Both the Supreme Court of the United States and the Supreme Court of the State of California have recognized the very high degree of discretion and responsibility required of a probation officer in the performance of his duties. In *Gagnon v. Scarpelli*, 411 U.S. 778, 784, 93 S.Ct. 1756, 1760, 36 L.Ed.2d 656 (1973), the Court said:

"Because the probation or parole officer's function is not so much to compel conformance to a strict code of behavior as to supervise a course of rehabilitation, he has been entrusted traditionally with broad discretion to judge the progress of rehabilitation in individual cases, and has been armed with the power to recommend or even to declare revocation."

In *In re Wayne H.*, 24 Cal.3d 595, 601, 156 Cal.Rptr. 344, 596 P.2d 1 (1979),[2] the Supreme Court of the State of California, in discussing the responsibilities of a probation officer while conducting a juvenile investigation to determine whether the juvenile should be further detained, said:

"While the purposes of such an interview are relatively restricted, however, the latitude given the probation officer in reaching a detention decision, and the effect of that decision on the minor, are substantial."

Probably the most sensitive area in which police officers and probation officers are both called upon to exercise discretion and judgment is in the making of arrests of individuals in appropriate cases. Any arrest by whomever made is a major intrusion upon the life of the victim and the entrusting of the power and discretion upon a public officer to make or withhold an arrest is a matter of the highest concern to the state. While it is true a police officer deals with a broad segment of the citizenry, whereas a probation officer deals with a very narrow segment of the population, an arrest by a probation officer requires no less a degree of judgment or discretion than an arrest by a police officer. Any abuse or misuse of such power by either can have just as severe an impact on the individual arrested and upon society at large.

I would find no difficulty in holding that the duties of a probation officer involve a very high degree of discretionary decision-making which substantially affects members of the political community.

In *Ambach*, the Court held that teachers pursuing their role in the public education system fulfill a most fundamental obligation of government to its constituency. 441 U.S. at 78–79, 99 S.Ct. at 1595–1596. The Court further said in summary:

"Thus, through both the presentation of course materials and the example he sets, a teacher has an opportunity to influence the attitudes of students toward government, the political process, and a citizen's social responsibilities."

*Id.* at 79, 99 S.Ct. at 1596 (footnote omitted).

While a teacher has both the duty and the opportunity on a day-to-day basis to work with a broad segment of school children, a probation officer through his role has the duty and the opportunity by suggestion, supervision, example, and instruction of bringing the same kind of influence to a narrow class of problem individuals, selected because of their antisocial behavior, upon whom the impact of such influence is even more critically needed than by the normal child in the public classroom.

The majority, in distinguishing between the duties of a police officer and a teacher, on the one hand, and a probation officer, on the other, places great reliance upon the fact that policemen and school teachers exercise their discretion and responsibility in a great variety of situations and deal with

---

**2.** Although the *Fare v. Michael C.*, 442 U.S. 707, 99 S.Ct. 2560, 61 L.Ed.2d 197 (1979) opinion places portions of the California Supreme Court's opinion in *In re Wayne H.* in doubt, the portion dealing with the responsibilities and discretionary powers of the probation officer are in no way affected.

large segments of the community. In my view, however, the determining factor is not the size of the arena in which the policemen or teachers exercise their judgment and discretion, nor the number of times in a given period that they are called upon to exercise such judgment, nor the great variety of occasions upon which they are called to act. What is important is the weight of the impact which these judgments, when made, have upon the process of state government.

Jurors have been held so closely associated with the state's democratic political institutions that these positions may be reserved for citizens. *See Perkins v. Smith*, 370 F.Supp. 134 (Md. 1974), *aff'd*, 426 U.S. 913, 96 S.Ct. 2616, 49 L.Ed.2d 368 (1976). Yet, a juror does not confront a broad segment of the citizenry, nor does he exercise a multitude of functions on a great number of occasions. He may only sit on one case in a lifetime, but upon this one occasion he serves such a vital part of the state's judicial function that the courts have recognized the state's right to insist that only citizens fill this role.

The probation system, and its probation officers through which it is enforced, play an integral role in the operation of the judicial system. Almost every sentence imposed by any judge upon a criminal offender is fashioned in large measure upon the recommendation of a probation officer. The impact of such recommendations upon the judicial process is only slightly less than the decision made by the judge himself and equates favorably in importance with anything done by a police officer, a teacher or a juror in furthering the governmental function.

*Application of the Rational Basis Test*

In the light of the foregoing considerations, therefore, I would hold that probation officers come clearly within the "governmental function" principle recognized in *Sugarman, Foley* and *Ambach*.

It cannot be disputed that the State of California has a legitimate interest in the efficient operation of a law enforcement system in this state in which a probation

officer plays an important part. Since the Constitution only requires that a citizenship requirement applicable to a probation officer bear a rational relationship to a legitimate state interest, I would hold that the statute meets the rational test and should be applied.

Accordingly, I dissent.