Fariborz TAYYARI et al., Plaintiffs,

v.

### NEW MEXICO STATE UNIVERSITY et al., Defendants.

### No. CIV–80–0447 C.

United States District Court,
D. New Mexico.

Aug. 29, 1980.

Dan A. McKinnon, III, Paul A. Phillips, Albuquerque, N. M., for plaintiffs.

William B. Darden, Darden & Darden, Las Cruces, N. M., for defendants.

R. E. Thompson, U. S. Atty., Albuquerque, N. M., Walter Gorman, Frederick S. Mittelman, Dept. of Justice, Civil Rights Div., Washington, D. C., for amicus curiae.

## MEMORANDUM OPINION

CAMPOS, District Judge.

This case is before the Court on application by Plaintiffs for a declaratory judgment and permanent injunction. Money damages are not sought. Plaintiffs are 15 Iranian citizens, students at New Mexico State University (NMSU), and in good standing with the Immigration and Naturalization Service (INS) in respect to visa status. Defendants are NMSU, the Board of Regents of NMSU (Regents) and the five individual members of the Board of Regents. By letter of August 6, 1980 to the United States Attorney for New Mexico, I invited the United States to intervene or to participate as *amicus curiae*. I was concerned about the importance of this case as it may relate to United States foreign policy or immigration policy. The United States declined to intervene, but moved for leave to appear as *amicus curiae*. Leave was granted.

This controversy arises out of action taken by Regents designed to rid the campus of Iranian students. For the reasons discussed below, the Court concludes that such action must be declared unconstitutional and that defendants must be permanently enjoined from implementing that action.

The essential facts are not in dispute. On May 9, 1980 Regents passed the following Motion:

. . . that any student whose home government holds, or permits the holding of U. S. citizens hostage will be denied admission or readmission to New Mexico State University commencing with the Fall 1980 semester unless the American hostages are returned unharmed by July 15, 1980.

To clarify its original action, Regents passed a Substitute Motion on June 5, 1980, which reads:

Any student whose home government holds or permits the holding of U. S. citizens hostage will be denied subsequent enrollment to New Mexico State University until the hostages are released unharmed. The effective date of this motion is July 15, 1980.

It is this Substitute Motion whose validity is now at issue.

At the court hearing on July 16, 1980, the parties agreed to the entering of a preliminary injunction pending final decision on the merits. Defendants have been enjoined from enforcement of their motion as it applies to the Plaintiffs during the pendency of this action.

Another stipulation made at the hearing is that only in Iran are United States hostages held with permission of the home government. To date one hostage has been released for medical reasons.

Two Plaintiffs are "immigrant aliens." They are in this country on permanent residency status and are eligible for naturalization after five years of residence here. 8 U.S.C. Sections 1101, 1427(a). The rest of Plaintiffs are "nonimmigrant aliens" who are admitted for a fixed period of time for a specific purpose, in this case on student visas to attend school. The Substitute Motion on its face affects both types of aliens.

■ Before discussing the merits of Plaintiffs' contentions, I must consider some jurisdictional and other preliminary matters raised by Defendants. Plaintiffs allege jurisdiction under 28 U.S.C. Sections 1343(3) and (4)[1] and 28 U.S.C. Sections 2201 and 2202 over a cause of action created by 42 U.S.C. Sections 1981, 1983 and 2000d. No argument is made by Defendants that jurisdiction is not proper under 28 U.S.C. Sections 2201 and 2202. However, neither of these sections creates federal district court jurisdiction unless it otherwise exists. *McGrath v. Weinberger*, 541 F.2d 249 (10th Cir. 1976) *cert. denied*, 430 U.S. 933, 97 S.Ct. 1557, 57 L.Ed.2d 778 (1977); *Thompson v. Groshens*, 475 F.2d 127 (3d Cir. 1973), *cert. denied*, 414 U.S. 825, 94 S.Ct. 127, 38 L.Ed.2d 58 (1973). These sections merely create remedies of declaratory judgment and other relief where jurisdiction exists under other statutes.

■ 28 U.S.C. Section 1343(a)(3) gives this Court jurisdiction over "any civil action authorized by law to be commenced by any person . . . to redress the deprivation (by a state) of any right . . . secured by the Constitution of the United States or by any Act of Congress providing for equal rights of . . . all persons within the jurisdiction of the United States." Defendants argue that this jurisdictional statute is inapplicable here because it is "necessarily related" to 42 U.S.C. Section 1981. They further argue that Section 1981 cannot provide a cause of action for these Plaintiffs because it is a provision to redress only racial discrimination, not discrimination based on national origin. The second part of Defendants' argument is addressed below. The first part of this argument is defective because 28 U.S.C. Section 1343(a)(3) is not tied only to 42 U.S.C. Section 1981. Rather, it is a broad jurisdictional grant to redress deprivation of *any* constitutional right and to redress deprivation of equal rights where those rights are secured by statute. Thus, this section is tied not only to 42 U.S.C. Section 1981 but also to 42 U.S.C. Section 1983 and through them to the Fourteenth Amendment to the United States Constitution. In fact, 28 U.S.C. Section 1343(a)(3) has been called the "jurisdictional counterpart" of 42 U.S.C. Section

---

1. 28 U.S.C. Section 1343 was amended December 29, 1979, to designate the original subsections (1), (2), (3) and (4) as (a)(1), (a)(2), (a)(3) and (a)(4). No change was made in the wording of the original subsections. The only substantive change was the addition of subsection (b) to include the District of Columbia.

1983. *Lynch v. Household Finance Corp.*, 405 U.S. 538, 540, 92 S.Ct. 1113, 1115, 31 L.Ed.2d 424 (1972).

■ Section 1343(a)(4) gives this Court jurisdiction over ". . . any civil action authorized by law to be commenced by any person . . . to recover damages or to secure equitable or other relief under any Act of Congress providing for the protection of civil rights, including the right to vote." Defendants do not argue that this subsection does not grant jurisdiction if a claim has been stated under 42 U.S.C. Section 1983. Subsection (4) is a rather recent addition to 28 U.S.C. Section 1343. It is the jurisdictional counterpart of the Civil Rights Act of 1957, a special voting rights statute which has been amended several times and is now codified at 42 U.S.C. Section 1975, *et seq.* 1 Moore's Federal Practice, Para. 0.62(9). Some courts have held that subsection (4) does not provide jurisdiction under Section 1983, *e. g., Andrews v. Maher*, 525 F.2d 113 (2d Cir. 1975), but in that case no substantial constitutional question had been presented. Where, as here, there appears a substantial constitutional question, subsection (4) expands existing federal district court jurisdiction pursuant to Sections 1983 and 1981 not only to actions under Section 1975, but to actions under other statutes as well. *See, e. g., Jones v. Alfred H. Mayer Co.*, 392 U.S. 409, 88 S.Ct. 2186, 20 L.Ed.2d 1189 (1968). I conclude that this Court has jurisdiction under both 28 U.S.C. Section 1343(3) and (4) over a cause of action created by 42 U.S.C. Sections 1981 and 1983. Thus, the inquiry must turn to whether Plaintiffs have stated a cause of action under either 42 U.S.C. Sections 1981 or 1983 or both.

■ 42 U.S.C. Section 1981[2] grants the same rights to "all persons" as are enjoyed by "white citizens." This section has generally been interpreted to proscribe racial discrimination, and to be based on the Thirteenth Amendment's abolition of slavery, rather than on the Fourteenth Amendment's guarantees of due process and equal protection. *Johnson v. Railway Express Agency*, 421 U.S. 454, 95 S.Ct. 1716, 44 L.Ed.2d 295 (1975); *Runyon v. McCrary*, 427 U.S. 160, 96 S.Ct. 2586, 49 L.Ed.2d 415 (1976); *Jones v. Alfred H. Mayer Co.*, 392 U.S. 409, 88 S.Ct. 2186, 20 L.Ed.2d 1189 (1968). However, there is language in *Manzanares v. Safeway Stores, Inc.*, 593 F.2d 968 (10th Cir. 1979) to suggest that discrimination on the basis of national origin or alienage may afford a basis for suit under 42 U.S.C. Section 1981. The Tenth Circuit Court of Appeals made clear that it viewed Section 1981 as "not necessarily limited to the technical or restrictive meaning of 'race.'" 593 F.2d at 971. The court stated:

> The measure is group to group, and plaintiff has alleged that the "group" to which he belongs–those he describes as of Mexican American descent–is to be measured against the Anglos as the standard. . .
> In this holding we consider that Mexican American, Spanish American, Spanish–surname individuals, and Hispanos are equivalents, and *it makes no difference whether these are terms of national origin, alienage, or whatever.* It is apparent that a group so described is of such an identifiable nature that the treatment afforded its members may be measured against that afforded the Anglos. *Id.* at 970 (emphasis added).

The *Manzanares* measure has found support in Note, Developments in the Law–Section 1981, 15 Harvard Civil Rts. Civil Liberties L.Rev. 29, 88–90 (1980). The Note suggests that a preferable approach would be to question whether a group is "commonly perceived to be racially different from the white majority . . . regardless of its 'objective' racial composition. . . ." *Id.* at 89–90. Iranian noncitizens can fit into the group protected by the statute ("all persons") as contrasted to the control group

---

2. 42 U.S.C. Section 1981 reads in its entirety: All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other.

("white citizens"). *See, also, McDonald v. Santa Fe Trail Transportation Co.*, 427 U.S. 273, 96 S.Ct. 2574, 49 L.Ed.2d 493 (1976) (white citizens are protected against racial discrimination by Section 1981). I conclude that 42 U.S.C. Section 1981 provides a basis for Plaintiffs' cause of action in this case, and supports this Court's jurisdiction under 28 U.S.C. Section 1343(a)(3) and (4).

An alternative basis for this action is 42 U.S.C. Section 1983.[3] In view of the broad reach of this statute, Defendants argue only that they are immune from suit here by virtue of the Eleventh Amendment.[4]

■ The question of whether a defendant is immune is not a jurisdictional issue in a civil rights suit. Rather, immunity is an affirmative defense which may defeat relief once subject matter jurisdiction has been established. *Robinson v. Bergstrom*, 579 F.2d 401 (7th Cir. 1978). There is no question but that subject matter jurisdiction is proper under 28 U.S.C. Sections 1343(a)(3) and (4) for a cause of action under Section 1983. There is no question but that Plaintiffs have stated a claim under Section 1983. Thus, I conclude that I do have subject matter jurisdiction in this case.

■ The Court believes that the immunity argument lacks merit. The Eleventh Amendment, by its express terms, extends immunity only to states, and the State of New Mexico is not here named as a defendant. But the courts have extended Eleventh Amendment immunity to arms or instrumentalities of states as well. *Ford Motor Co. v. Dept. of Treasury*, 323 U.S. 459 (1945). Instead of going into an analysis of whether NMSU is an arm or instrumentality of the State, *see, Monell v. New York City Dept. of Social Services*, 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978), *Owen v. City of Independence*, 445 U.S. 622, 100 S.Ct. 1398, 63 L.Ed.2d 673 (1980), *Gay Rights v. Texas A & M*, 612 F.2d 160 (5th Cir. 1980), and *Hillis v. Stephen F. Austin State University*, 486 F.Supp. 663 (E.D.Tex. 1980), it should be noted that Plaintiffs here do not seek money damages. Immunity from damages does not ordinarily bar injunctive relief. *Wood v. Strickland*, 420 U.S. 308, 315–316 n.6, 95 S.Ct. 992, 997–98, 43 L.Ed.2d 214 (1975), *reh. denied* 421 U.S. 921, 95 S.Ct. 1589, 43 L.Ed.2d 790 (1975). The *Ex parte Young* fiction, that a state officer cannot act in his official capacity in an unconstitutional manner, 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714 (1908) would allow declaratory and injunctive relief to be granted against the members of the Board of Regents. Thus, Defendants' immunity defense must fall.

Plaintiffs also allege violation of Title VI of the Civil Rights Act of 1964, 42 U.S.C. Section 2000d:

No person in the United States shall, on the ground of race, color or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance.

This statute is enforceable under the jurisdictional grants of both Section 1343(a)(3) and (4). It is an "Act of Congress providing for equal rights" within the meaning of subsection (3). It is also an "Act of Congress providing for the protection of civil rights" within the meaning of subsection (4).

■ It was stipulated by the parties at the hearing that NMSU receives federal funds. Thus, Defendants are subject to the

---

**3.** 42 U.S.C. Section 1983 reads in its entirety: Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress. For the purposes of this section, any Act of Congress applicable exclusively to the District of Columbia shall be considered to be a statute of the District of Columbia.

**4.** The Eleventh Amendment reads: The Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States, by Citizens of another State, or by Citizens or Subjects of any Foreign State.

provisions of Title VI. Private plaintiffs have standing to enforce the provisions of the statute. *Otero v. Mesa County Valley School Dist. No. 51*, 568 F.2d 1312 (10th Cir. 1977); *Bossier Parish School Board v. Lemon*, 370 F.2d 847, 852 (5th Cir. 1967), *cert. denied* 388 U.S. 911, 87 S.Ct. 2116, 18 L.Ed.2d 1350 (1967); *cf. Cannon v. University of Chicago*, 441 U.S. 677, 99 S.Ct. 1946, 60 L.Ed.2d 560 (1979) (private cause of action under Title IX of the Education Amendments of 1972). Thus there is federal jurisdiction to consider Plaintiffs' Title VI claim.

■ Defendants next argue that there exists no case or controversy here that is ripe for judicial decision because Plaintiffs have not yet been denied enrollment. They argue the case may become moot if the hostages are released unharmed before enrollment is actually denied, or if individual Plaintiffs are ineligible for some other reason, such as nonpayment of fees. It is true that enrollment for the Fall semester had not commenced at the time of the hearing in this case. I conclude, however, that the threat of being denied enrollment is sufficiently real and imminent to make this case ripe for decision at this time.[5] If Plaintiffs were denied enrollment, they would have to make other plans for school attendance because their student visas are conditioned upon attendance at an American school. It would be improvident to make Plaintiffs wait until actual denial of enrollment to bring this action. Nor has release of the hostages ever seemed likely to come about soon.[6] The difference between a hypothetical or abstract question and a "case or controversy" is one of degree. The basic inquiry is whether the "conflicting contentions of the parties . . . present a real, substantial controversy between parties having adverse legal interests, a dispute definite and concrete, not hypothetical or abstract." *Babbitt v. United Farm Work-*

ers *Nat'l Union*, 442 U.S. 289, 298, 99 S.Ct. 2301, 2308, 60 L.Ed.2d 895 (1979), *citing Railway Mail Ass'n v. Corsi*, 326 U.S. 88, 93, 65 S.Ct. 1483, 1487, 89 L.Ed. 2072 (1945). Plaintiffs have demonstrated a realistic danger of sustaining direct injury as a result of enforcement of Regents' Substitute Motion, thus the questions presented to me are not abstract or hypothetical.

As for the potential ineligibility of some Iranian students for enrollment at NMSU on a basis other than Regents' Substitute Motion, this argument is precluded by a stipulation entered into between Plaintiffs and Defendants at the hearing. That stipulation was to the effect that these Plaintiffs would be eligible for reenrollment but for the Motion adopted by Regents. Therefore, the Court may proceed to the merits of Plaintiffs' contentions.

Plaintiffs claim they are being denied equal protection of the laws and due process rights guaranteed to them under the Constitution of the United States. They seek a judicial declaration that the action of the Regents in adopting the Motion denying Plaintiffs subsequent enrollment at NMSU is unconstitutional. Also, they pray for an injunction permanently enjoining Defendants from implementing the challenged Motion.

*EQUAL PROTECTION.* The first inquiry in an equal protection analysis is into the nature of the classification involved in the challenged action. This is important for it establishes the Court's standard of review of that action. The classification here is along lines of both alienage and national origin. Regents' motion distinguishes between aliens and United States citizens because it is directed at students with a home government other than the United States. At the hearing, Defendants further refined the alienage classification by stating that the motion would not be

---

**5.** At the hearing, Defendants announced that they did not intend to apply their Substitute Motion as against the two Plaintiffs who are immigrant aliens. Since those Plaintiffs are under no real threat of injury, I conclude that they do not have standing to challenge the motion.

**6.** The death of the Shah occurred after the date of this hearing. Even that event has not produced noticeable movement in the hostage situation.

applied against the two immigrant alien Plaintiffs. Thus, the class against which Regents' action is directed is nonimmigrant aliens. No rationale has been presented by Defendants for distinguishing among aliens according to their immigrant status except that Defendants admit they believe the Motion could not constitutionally be applied to these immigrant aliens.

■ Aliens residing in our land have long enjoyed protection of the United States Constitution. The Fourteenth Amendment protects not only citizens, but also "any person" within a state's jurisdiction, from unequal treatment at the hands of the state. *See, Yick Wo v. Hopkins,* 118 U.S. 356, 6 S.Ct. 1064, 30 L.Ed. 220 (1886) (aliens cannot be excluded from laundry business); *Truax v. Raich,* 239 U.S. 33, 36 S.Ct. 7, 60 L.Ed. 131 (1915); *Takahashi v. Fish & Game Comm'n,* 334 U.S. 410, 68 S.Ct. 1138, 92 L.Ed. 1478 (1948).

Alienage has been treated under modern equal protection analysis as a suspect classification, *Graham v. Richardson,* 403 U.S. 365, 91 S.Ct. 1848, 29 L.Ed.2d 534 (1971), thus invoking strict judicial scrutiny of a state's challenged action.[7] While states may deny aliens the right to vote, a traditional badge of citizenship, they may not deny aliens welfare benefits, *Id.,* competing for certain civil service jobs, *Sugarman v. Dougall,* 413 U.S. 634, 93 S.Ct. 2842, 37 L.Ed.2d 853 (1973), membership in the Bar, *In re Griffiths,* 413 U.S. 717, 93 S.Ct. 2851, 37 L.Ed.2d 910 (1973), or engineering jobs, *Examining Board v. Flores de Otero,* 426 U.S. 572, 96 S.Ct. 2264, 49 L.Ed.2d 65 (1976). In this line of cases, the one most on point for our purposes is *Nyquist v. Mauclet,* 432 U.S 1, 97 S.Ct. 2120, 53 L.Ed.2d 63 (1977). In that case, the Supreme Court found an equal protection violation where the State of New York denied aliens the right to receive state financial assistance for higher education. Plaintiffs argue that if a state cannot deny aliens financial assistance for a college education, *a fortiori* it cannot deny them the education itself.

Defendants argue that alienage is not always a suspect classification. While *Graham v. Richardson, supra,* and its progeny have never been expressly overruled, Defendants cite recent cases in which the Supreme Court has applied a lesser standard, that of rationality, to the challenged state action involving aliens. *Foley v. Connelie,* 435 U.S. 291, 98 S.Ct. 1067, 55 L.Ed.2d 287 (1978), and *Ambach v. Norwick,* 441 U.S. 68, 99 S.Ct. 1589, 60 L.Ed.2d 49 (1979).

*Foley* and *Ambach* relied on language in *Sugarman* that left open the door for a ban on employment of aliens for certain positions in state government. *Sugarman* used strict scrutiny, and looked to "the substantiality of the State's interest in enforcing the statute in question, and to the narrowness of the limits within which the discrimination is confined," 413 U.S. at 642, 93 S.Ct. at 2847. In *Sugarman,* the statute in question did not pass constitutional muster primarily because the statute, barring aliens from all competitive civil service jobs, was "neither narrowly confined nor precise in its application," 413 U.S. at 643, 93 S.Ct. at 2848. The Court recognized as legitimate and substantial, however, the State's interest in having loyal citizens as civil servants to formulate and execute government policy. It stated that its scrutiny would be less demanding when dealing with matters related to a state's self–government, "a State's constitutional prerogatives," 413 U.S. at 648, 93 S.Ct. at 2850.

*Foley* involved a challenge against a New York statute limiting state police jobs to United States citizens. The Court upheld the statute, finding a rational relationship between the interest sought to be protected (state self–government by loyal employees executing governmental policy) and the limiting classification. The reason for not employing strict judicial scrutiny was that the police function "involves discretionary decisionmaking, or execution of policy, which substantially affects members of the political community," 435 U.S. at 296, 98 S.Ct. at 1071.

---

**7.** The question here, then, is not whether the right to a college education is a fundamental right. The Court need not reach that question since strict scrutiny is required because of the suspect classification. 403 U.S. at 376, 91 S.Ct. at 1854.

The Court in *Ambach* applied the rational basis test to a New York statute restricting public elementary and secondary school teaching positions to citizens and noncitizens intending to become citizens. Use of this standard was again justified on the basis of the discretionary role of public school teachers in teaching political values to children. The Court found public school teachers to fulfill a "governmental function" so as to invoke less demanding judicial scrutiny, 441 U.S. at 75, 99 S.Ct. at 1594.

■ The distinguishing factor, then, between this case and the situations present in *Foley* and *Ambach*, is that students attending a state university do not perform any discretionary function implicating the state's right to self–government. Thus, the governmental function exception to the general rule that alienage is a suspect classification requiring strict judicial scrutiny, is not called into play here. *Graham* and *Nyquist* control.

■ Alienage is not the only suspect classification involved here. Even though no nation is named in the Substitute Motion, the classification is necessarily based on national origin. A student with a home government other than the United States is a student from a foreign country. If that country permits the holding of United States hostages, then students from that country, and only students from that country, are affected. Not only is the effect so limited, but testimony and exhibits at the hearing show the clear purpose of Regents was to exclude only students of one nationality: Iranian. Nationality is another suspect classification calling for strict judicial scrutiny. *Hernandez v. Texas*, 347 U.S. 475, 74 S.Ct. 667, 98 L.Ed. 866 (1954); *McLaughlin v. Florida*, 379 U.S. 184, 85 S.Ct. 283, 13 L.Ed.2d 222 (1964). Even Justice Rehnquist, who believes the Fourteenth Amendment should only protect against racial discrimination, seems to look askance at a state statute discriminating against aliens on the basis of nationality. In *Sugarman*, he said:

The state statute that classifies aliens on the basis of country of origin is much more likely to classify on the basis of race, and thus conflict with the core purpose of the Equal Protection Clause, than a statute that . . . merely distinguishes between alienage as such and citizenship as such. 413 U.S. at 655, 93 S.Ct. at 2864 (dissenting opinion).

■ Defendants' final argument against use of strict judicial scrutiny is based on *Narenji v. Civiletti*, 617 F.2d 745 (D.C. Cir. 1979), *cert. denied*, —— U.S. ——, 100 S.Ct. 2928, 64 L.Ed.2d 815 (1980). In that case, the court of appeals applied the rational basis test and upheld a regulation promulgated by the Attorney General at the direction of President Carter. The regulation required all Iranian students of higher education who are nonimmigrant aliens to clear their status with INS or risk deportation proceedings. That case involved not state action but action by the executive branch of the federal government. The decision rested on principles of separation of powers: the President is vested with authority over foreign affairs. That authority sometimes requires distinctions to be drawn along lines of alienage and national origin. It is not the province of the judicial branch to closely scrutinize actions by the President which bear some rational relationship [8] to his authority over foreign affairs. But here we do not deal with presidential action, we are dealing with state action. No credible policy reason has been advanced by Defendants to support their contention for relaxed scrutiny as applied to Regents' action.

■ None of the reasons offered by Defendants for their action rises to that level of compelling state interest which withstands strict scrutiny. Their first justification is financial: credit is extended to Iranian students and they might not pay their bills. If they don't pay their bills it wouldn't be fair to make the citizens of

---

8. Alienage as a classification is unique in equal protection analysis. It is the only classification for which courts have applied different levels of scrutiny for federal actions as opposed to actions by states. Note, State Burdens on Resident Aliens: A New Preemption Analysis, 89 Yale L.J. 940, 944 n. 24 (1980).

New Mexico pick up all the fees for Iranian students while financing all other students only partially. And if the Iranian students don't pay, it wouldn't be fair to let them stay in student housing since there is a shortage and students who would pay should be given housing. Finally, if the Iranian students don't pay their bills it might be difficult to collect amounts owing because the Iranian embassy in the United States has been closed.

The action taken by Regents – barring all Iranian students from enrolling at NMSU – sweeps too broadly and too indiscriminately if their true concern is financial. If Regents' true concern be financial, they have, in a figurative sense, thrown out the baby with the bath water.

First of all, Regents have come up with a financial justification rather late in the game. This was a wobbly afterthought first articulated at the hearing. No such concerns were publicly expressed prior to the hearing. Notably, the only mention of finances in the Regents' minutes of May 9, 1980, Plaintiffs' Exhibit 2, is that the taxpayers shouldn't have to support Iranian students at NMSU. The reasoning given for that proposition at the time had nothing to do with whether Iranian students could or would pay their bills. It was that Iran had become an enemy of the United States and that Americans are angry and fed up with Iranians and, therefore, Iranian students shouldn't get any benefits from New Mexico taxpayers. I find that concerns about finances at NMSU did not underlie Regents' action.

Second, even if finances were a true concern of Regents, Defendants have utterly failed to demonstrate any fiscal danger posed by Iranian students. Evidence admitted at the hearing showed only that some Iranian students owed the school money in May 1980. Apparently, credit is extended to students for school expenses. As of the date of the hearing, only two Plaintiffs were in arrears, for a total of $930.00. Several others still owed money but were not in arrears. Three were paid up. It should be noted that a fiscal policy at NMSU applies to all students:

(A)ll fees and bills owed NMSU must be paid in full before a student may enroll in any subsequent Fall or Spring semester. These bills include payment of library fees, payment of dormitory and residence fees, and payment of all bills incurred for such items as those purchased from the University Book Store and the University Cafeteria. Defendants' Trial Brief, 2.

Presumably, tuition is one of the "fees" which must be paid in full prior to reenrollment. Since no student can enroll if his or her payments are in arrears, there seems no present danger of large bills going unpaid by Iranian students. Moreover, it was not demonstrated that Iranian students are any less likely to pay than other students. Exclusion of all Iranian students because some of them may in the future end up owing money seems misdirected and extreme.

This post–hoc fiscal rationale is certainly insufficient to justify the action taken by Regents. Even if Regents' action had been more rationally related to fiscal concerns, such as requiring Iranian students to pay more tuition than other students or to pay all their expenses in advance, they would have to show a compelling need for it. No showing at all was made in this Court, beyond mere speculation about the future, that Iranian students are poor credit risks. In Mississippi, recently, a federal district court granted a preliminary injunction restraining the State's Board of Trustees from enforcing an appropriation bill raising tuition for students whose home government does not have diplomatic relations with the United States and against which the United States has economic sanctions. *Shabani v. Simmons*, No. EC80–160–LS–P (N.D.Miss. July 3, 1980).[9] That bill was struck down, at least preliminarily, even though it is finely focused on fiscal considerations. *Nyquist, supra,* controls both cases and instructs that in this case Regents' action is impermissible.

---

**9.** Although that bill was aimed at Iranians, it may also affect students from Cuba, Vietnam, Cambodia, Albania, Iraq, and the Peoples Democratic Republic of Yemen. Decision at 2 n. 1.

Another rationale advanced by Defendants for Regents' action is safety. They are assertedly concerned that if Iranian students are allowed to remain on campus, some physical harm may come to them, to others on campus, and to campus buildings. Regents perceive their duty to protect these people and things as being discharged by their Substitute Motion. I do not agree. Again, the action sweeps too broadly and indiscriminately.

 Various witnesses testified that "tensions" were present on campus last Fall surrounding some sort of demonstration relating to the Iranian–American situation. No actual damage occurred at that time, but it is feared that worse things lay ahead. Concern in the administration is sufficiently high that contingency plans to protect the safety of Iranian students have been formulated. For such foresight and true concern, the administration is to be highly commended. Formulation of contingency plans to protect lives is a rational way to accomplish the end of safety. Expulsion of a distinct sub–group of alien students, even though the presence of that group is perceived to be the cause of the controversy, is not a permissible solution. The court–ordered presence of blacks in places whites thought they didn't belong has provoked more than one incident of violence in this country's history. But such occurrences cannot stem the tide of judicially ordered desegregation. It has been held that even though the sight of black armbands worn by students protesting the Vietnam war might potentially provoke a disturbance at school, students must be allowed to wear them unless there is actual substantial interference with the conduct of school activities by the students' action. *Tinker v. Des Moines School Dist.*, 393 U.S. 503, 89 S.Ct. 733, 21 L.Ed.2d 731 (1969). The Court stated that our Constitution says such risks must be taken. *Id.* at 508, 89 S.Ct. at 737.

And the Supreme Court in *Terminiello v. Chicago*, 337 U.S. 1, 69 S.Ct. 894, 93 L.Ed. 1131 (1949), recognized that the right to freedom of speech can overcome a state's interest in preventing breaches of the peace. If words cannot be characterized as "fighting words" likely to produce a clear and present danger of a serious substantive evil that rises far above public inconvenience, annoyance, or unrest, *Id.* at 4, 69 S.Ct. at 895, then those words and that speech are constitutionally protected. Defendants have failed to make any showing of a clear and present danger to persons or things on campus. Similarly, there has been no showing of actual substantial interference with the conduct of school activities caused by the Iranian students. They cannot be excluded as a class from reenrollment.

*DUE PROCESS.* Plaintiffs claim their right to procedural and substantive due process has been violated by Regents' summary action. With respect to their procedural due process claim, Plaintiffs point out the Substitute Motion was adopted without notice to them or an opportunity to be heard. Yet the Motion denies Plaintiffs the right to continue their education at NMSU. In support of their substantive due process claim, Plaintiffs allege Regents' Motion amounts to arbitrary, unreasonable and capricious action which fulfills no proper Board function.

A violation of due process can be found only if Plaintiffs have demonstrated they possess a liberty or property right or interest in being allowed to continue their education at NMSU. No effort was expended at the hearing to establish such a right or interest on the part of these Plaintiffs. It does seem that some university officials present at the May 9, 1980 meeting of the Board of Regents thought Plaintiffs did have at least a contract or property right to continue at NMSU. Plaintiffs' Exhibit 2 at 18–21. It has been university practice to apply the same rules and regulations to a student throughout his or her attendance at NMSU as were in effect when that student was admitted.

I am of the view that serious questions of a due process violation have been raised by Regents' action. However, I decline to rest my decision on this ground. Even if Plaintiffs had been afforded notice and an opportunity to be heard, Regents' action cannot withstand constitutional attack on equal

protection grounds. Nor, in the absence of more proof do I find it necessary to address more fully the substantive due process issue.

■■■ *TITLE VI.* Section 601 of the Civil Rights Act of 1964, 42 U.S.C. Section 2000d (Title VI) mandates that national origin cannot be the basis for excluding anyone from participation in a federally–funded program. The only evidence introduced with respect to receipt of federal funds was the stipulation that NMSU is a recipient of federal funds. In my view, this is not enough to support a finding of violation of Title VI. There is no indication in the record of the amount of federal funds received or of how federal funds are spent.

While it is difficult to believe that the federal funds received by NMSU are not substantial or that they are not spent for the benefit of these Plaintiffs, I conclude that Plaintiffs have failed in their proof here. In view of my disposition of the rest of this case, I do not feel constrained to reopen this issue for presentation of further proof. Plaintiffs are herein granted all the relief they have sought, thus, no prejudice or unfairness results from dismissal of Plaintiffs' Title VI claim.

■■■ *PREEMPTION.* Plaintiffs and the United States as *amicus curiae* urge that Regents' Substitute Motion be struck down for another reason, that it interferes with federal immigration policy and federal foreign policy. The focus shifts, then, from the rights of Plaintiffs to the superior right of the federal government to exercise exclusive power and control over aliens and to dictate foreign policy without interference from the states. Defendants argue that they did not intend to enter the area of immigration policy or foreign policy, and that in any event their Substitute Motion will not interfere with federal policy. Even if Regents' Motion did not violate Plaintiffs' Fourteenth Amendment rights, I conclude that its potential effect on this nation's management of immigration and foreign affairs would dictate its demise.

It is evident from the record in this case that Regents' true purpose in enacting the Substitute Motion was to make a political statement. *See, especially,* Plaintiffs' Exhibit 2 (minutes of Regents' meeting of May 9, 1980). Individual Regents had been under pressure because of their own personal reactions to the hostage crisis and from New Mexico taxpayers to "do something" about the Iranian students on campus. Anger and frustration about the hostage situation sought an accessible scapegoat. Iranian students on campus receive the benefits of a higher education subsidized by money from the State tax coffers. Regents decided to retaliate against Iran and the Iranian students, the latter as a class, by depriving the students of the right to continue to receive an education at NMSU.

In view of Regents' purpose, the Court's role becomes more clear. Strong negative reactions to the hostage situation have become commonplace. Hostility towards those responsible for the continued crisis has risen to the level of xenophobia directed against all Iranians without regard to their affiliations as to the present regime in Iran. The anger being expressed against the government of Iran is understandable and completely justified in the face of the hostile and illegal action taken against our citizens in that foreign land. This crisis tests our country's patience. It also tests our country's commitment to its fundamental principles of liberty expressed in the Constitution. In my view, Regents have gone beyond personal expression of their anger and frustrations in a permissible way. Their action is cloaked with the power of the State, and they have entered the arenas of foreign affairs and immigration policy, interrelated matters entrusted exclusively to the federal government.

Immigration policy is subsumed under the general topic of foreign affairs. It can be used to manipulate affairs with foreign nations. The power to regulate the entrance and residence of aliens in the United States rests exclusively with the federal government. That power derives from the Constitution and perhaps from the law of nations, an inherent power which antedated the Constitution. Although the Constitution does not mention the power to regulate immigration, it is deemed to derive from

various provisions. These include the power of Congress to make a uniform rule of naturalization, U. S. Const. Art. I, Section 8, cl. 4, and the power of Congress to regulate commerce with foreign nations, *Id.* at cl. 3. *See, United States v. Pink,* 315 U.S. 203, 233, 62 S.Ct. 552, 567, 86 L.Ed. 796 (1942) (power over external affairs vested in national government, not shared by states); *United States v. Curtiss-Wright Export Corp.,* 299 U.S. 304, 318, 57 S.Ct. 216, 220, 81 L.Ed. 255 (1936) (exclusive federal authority over foreign affairs).

The theory that federal power over foreign affairs, including the power to regulate immigration, is an inherent one which antedated the Constitution was expounded in *Curtiss-Wright,* 299 U.S. at 315–18, 57 S.Ct. at 218–20. *Accord, Nishimura Ekiu v. United States,* 142 U.S. 651, 12 S.Ct. 336, 35 L.Ed. 1146 (1892); *The Chinese Exclusion Case,* 130 U.S. 581, 9 S.Ct. 623, 32 L.Ed. 1068 (1889); *Fong Yue Ting v. United States,* 149 U.S. 698, 711, 13 S.Ct. 1016, 1021, 37 L.Ed. 905 (1893) (right to exclude or expel aliens is inherent right of all nations). The theory is based on the concept of sovereignty. Inability of a nation to regulate immigration would subject it to the power of foreign nations. *But see,* L. Tribe, *American Constitutional Law* Section 5–16, at 283–84 (1978) (positivist theory of sovereignty, rooted in international law and not the Constitution, is erroneous); Levitan, *The Foreign Relations Power: An Analysis of Mr. Justice Sutherland's Theory,* 55 Yale L.J. 467, 497 (1946) (no place for theory of "inherent" powers in American constitutional system).

The exclusive federal control over foreign affairs in general and over immigration policy in particular is conceded by Defendants. They argue only that their action was not intended to and, in fact, cannot have any effect on such matters. I disagree, and hold that Regents' action is preempted by federal control in this area.

The treatment of aliens has consistently been viewed as a national concern, subject to federal, and not state, supervision. *Takahashi v. Fish & Game Comm'n,* 334 U.S. 410, 420, 68 S.Ct. 1138, 1143, 92 L.Ed. 1478 (1948); *Hines v. Davidowitz,* 312 U.S. 52,

73, 61 S.Ct. 399, 407, 85 L.Ed. 581 (1941). The preemption doctrine, usually applied in analyses involving interstate commerce, has also been employed with equal protection principles in invalidating state restrictions against aliens. *Examining Board v. Flores de Otero, supra,* 426 U.S. at 602, 96 S.Ct. at 2281; *Graham v. Richardson, supra,* 403 U.S. at 376–380, 91 S.Ct. at 1854–56; *Truax v. Raich,* 239 U.S. 33, 42, 36 S.Ct. 7, 11, 60 L.Ed. 131 (1915). It is true that not every state action which adversely affects the activities of aliens in this country is preempted by federal authority. *De Canas v. Bica,* 424 U.S. 351, 96 S.Ct. 933, 47 L.Ed.2d 43 (1976) (state may exercise police power to prohibit employer from knowingly employing illegal aliens); *Clark v. Allen,* 331 U.S. 503, 516–17, 67 S.Ct. 1431, 1438–39, 91 L.Ed. 1633 (1947) (state may make rights to succession of property by aliens dependent on existence of reciprocal right in foreign country); *but see, Zschernig v. Miller,* 389 U.S. 429, 88 S.Ct. 664, 19 L.Ed.2d 683 (1968) (application of similar state probate statute constitutes intrusion into field of foreign affairs). In fact, NMSU imposes restrictions on all foreign students such as requiring them to be in good standing with INS, to submit a net worth statement before enrollment, to maintain full-time student status for both semesters, to maintain an up-to-date record in the university's Center for International Programs, to pursue a course of study leading to a degree, etc. Defendants' Trial Brief at 1–2. No challenge is made to those restrictions.

■ Whether state action affecting aliens is preempted depends on conflict with federal power and federal action. Aside from the fact that Regents' action against Iranian students violates their right to equal protection under the law, the NMSU policy limits the freedom of Iranian students to pursue studies in a state institution in a manner which directly conflicts with the spirit of federal statutes conferring student visas to aliens. If there are to be such restraints on Iranian students, they must be provided by the federal government. *Cf., Zschernig v. Miller, supra,* 389 U.S. at 441, 88 S.Ct. at 671 (as applied, state inheritance

statute depending on reciprocity has direct impact on foreign relations and may adversely affect power of central government to deal with problems); *Truax v. Raich, supra,* 239 U.S. at 42, 36 S.Ct. at 11 (state's denial of opportunity to earn a living tantamount to denial of admission of alien to state).

The federal government has already spoken with respect to how Iranians in our land should be treated. The Attorney General, at the direction of the President, promulgated a regulation, 8 C.F.R. Section 214.5 (November 14, 1979), requiring all nonimmigrant alien post-secondary school students from Iran to report to INS for the purpose of validating their student visas. It was this very regulation that was challenged and upheld in *Narenji v. Civiletti, supra.* If the federal government thought it advisable to rescind its invitation for Iranians to study here, presumably it could have revoked all Iranian student visas and instituted immediate deportation proceedings. That was not done. Rather, Iranian students have been permitted to remain here on valid student visas. Regents' policy intrudes on that permission.

Regardless of the effect on immigration policy, Regents' Motion frustrates the exercise of the federal government's authority to conduct the foreign relations of the United States. Especially in times of international conflict, it is essential that the United States speak with one official voice in its dealings with foreign powers. No branch of the federal government nor any state government in this country can stifle private expressions of anger and hostility against foreigners or foreign nations. Regents' Motion is not such a private expression—rather, it is an action cloaked with the officiality of an arm of the government of this State. I quote from a June 19, 1980, affidavit by David D. Newsom, Undersecretary for Political Affairs, United States Department of State:

> The situation in Iran is a vivid illustration of the need for centralized authority in foreign relations—of the need for the United States to be able to speak with one voice in its dealings with other nations. From the onset of the Iranian

crisis the President has exercised his powers and responsibilities under the Constitution and a variety of federal statutes, including those regulating aliens and national emergencies, to take actions, among them the imposition of sanctions, which he has deemed necessary in light of all the circumstances, including both the immediate and long range foreign relations interests of the United States. The nature, timing, and extent of each such action has required intensive consideration at the highest levels of the Federal Government and close coordination in light of the complexity and danger of this international emergency.

State action directed essentially against Iranians, in response to the hostage crisis, although motivated by a high sense of patriotism and intended to complement federal actions, would potentially impede the conduct of our foreign relations. Such action would constitute a serious unsanctioned state involvement in the conduct of United States foreign policy and international relations.

(It) would adversely affect an important specific element of United States policy in the Iranian crisis: the policy of nondiscrimination against Iranians lawfully in this country as set forth in the public statement issued on November 27, 1979, by Attorney General Civiletti. * * * It is . . . my judgment that a failure to provide Iranian nationals lawfully in this country with fair and nondiscriminatory treatment and the assurance of the equal protection of United States laws could have a negative impact on prospects for securing the early and safe release of the hostages. State actions of this nature will necessarily impair the Federal Government's ability to manage this crisis.

More generally, the Mississippi statute (at issue in *Shabani v. Simmons, supra*) runs counter to the traditional United States policy, in such areas as access to public education, of nondiscrimination on the basis of nationality against aliens lawfully in the United States. This policy is reflected in the United States' strong

support for developing international human rights standards, as expressed, for example, in the Universal Declaration of Human Rights and the International Covenant on Economic, Social and Cultural Rights, both of which provide for equal access for all to higher education, on the basis of capacity, without discrimination on the basis of national origin or other status. The introduction of such discrimination by law within a jurisdiction of the United States would be damaging to United States efforts to promote the widest realization internationally of human rights goals and standards.

Attachment B to *Amicus Curiae* brief (parenthetical remark added).

As recognized by the court in *Narenji*, the sensitive judgments as to the appropriate method of securing the release of the hostages are reserved by the Constitution to the President:

> (T)he present controversy involving Iranian students in the United States lies in the field of our country's foreign affairs and implicates matters over which the President has direct constitutional authority. . . .

> \* \* \* \* \* \*

> Certainly in a case such as the one presented here it is not the business of courts to pass judgment on the decisions of the President in the field of foreign policy. *Judges are not expert in that field and they lack the information necessary for the formation of an opinion.* The President on the other hand has the opportunity of knowing the conditions which prevail in foreign countries, he has his confidential sources of information and his agents in the form of diplomatic, consular and other officials.

617 F.2d at 748 (emphasis added). Regents, too, are not expert in the field of foreign policy and lack the requisite information.

As noted in the Newsom affidavit quoted above, Attorney General Civiletti issued a public statement on November 27, 1979, shortly after the issuance of his regulation requiring Iranian students to report to INS. In that statement, Civiletti condemned the taking of hostages in Iran, but reiterated the importance of extending constitutional liberties to everyone in our own country. He said:

> According to the news reports, some Iranians have been fired from their jobs, *expelled from universities*, and denied public accommodations. This conduct is not proper. A variety of federal laws prohibit discrimination based on national origin. These laws forbid treating people differently in such areas as employment, *public education*, housing, credit and public accommodations like restaurants and hotels. These laws—which do not involve the immigration laws—generally protect both citizens and non–citizens.

Attachment E to *Amicus Curiae* brief (emphasis added).

Further, the Department of State has assured the Algerian Embassy, as protecting power for Iranian interests, of the continuing legal protection afforded to Iranian nationals here. Diplomatic Note from Department of State to Democratic and Popular Republic of Algeria, June 20, 1980, Attachment E to *Amicus Curiae* brief.

The court in *Shabani* found that merely charging Iranians much higher tuition—not barring them completely as Defendants would do—might have a disruptive effect on the orderly handling of foreign affairs by the United States government. Decision at 4. The potential disruptive effect of Regents' motion is much greater.

In *Hines v. Davidowitz*, 312 U.S. 52, 61 S.Ct. 399, 85 L.Ed. 581 (1941), the Supreme Court applied a preemption analysis in striking down a state statute requiring adult aliens to register annually with the state. The Court found that federal law provided a comprehensive scheme for the regulation of aliens. It characterized state registration requirements as potentially affecting international relations. *Id.* at 74, 61 S.Ct. at 408. There, the state law affected all aliens, thus, theoretically diffusing any effect on this Country's foreign relations with any one nation. Here, Regents' motion is directed at one nation, Iran. Their purpose was to make a political statement about the hostage situation in Iran and to

retaliate against Iranian nationals here. The potential effect on international relations *vis–a–vis* Iran is much greater here than with a regulation affecting all aliens regardless of nationality. Attempts to solve the hostage crisis must come from the federal government. State officials in New Mexico must not impede those efforts.

I conclude that the action by Regents of NMSU imposes an impermissible burden on the federal government's power to regulate immigration and conduct foreign affairs. As such, it must be invalidated.

One of America's great radicals expressed an idea which deserves at least momentary reflection by all parties in this case as well as by anyone else who might be interested in this litigation—those in this country as well as those in the Islamic Republic of Iran. Incidentally, the name of that loved and admired American is also subscribed to the United States Constitution which has been before me today. To Mr. Benjamin Franklin of Pennsylvania are attributed these thoughts:

> God grant that not only the love of liberty, but a thorough knowledge of the rights of man may pervade all the nations of the earth so that a philosopher may set his foot anywhere on its surface and say, "this is my country."

These noble sentiments may indeed rest at dizzying heights of naiveté. From the practical and pragmatic perspective not much may realistically be claimed for them. But even conceding this, I suggest that the ideal is as civilized and as civilizing today as when Mr. Franklin articulated it about two hundred years ago.